# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**SUPERIOR CONSULTING SERVICES, INC.,**

      **Plaintiff,**

**v.**                                                   **Case No:   6:16-cv-2001-Orl-31GJK**

**SHAKLEE CORPORATION,**

      **Defendant.**

## ORDER

This matter comes before the Court after a hearing on the Motion for Preliminary Injunction (Doc. 19) filed by the Plaintiff, Superior Consulting Services Inc. ("Superior"), and the Response in Opposition (Doc. 43) filed by the Defendant, Shaklee Corporation ("Shaklee").

**I.  Background**

According to the facts provided by the parties in motions, affidavits, exhibits, and oral argument, Superior owns two Florida fictitious business entities called "Your Future Health" and "YFH" (collectively "Superior"). (Doc. 20 ¶ 5.) Ellie Cullen, a registered nurse, owns and operates Superior. Superior's "primary objective is the early detection of disease, through performing certain laboratory tests, including blood tests, for consumers." (*Id.* ¶ 7.) Superior accomplishes its objective by creating a profile "customized to a client's unique biochemistry," called a "Healthprint." (*Id.* ¶ 15.) A Healthprint is built from "a combination of laboratory tests and a series of written questions," and "centers around the principle that 'normal' blood test scores are not good enough to assist persons with the early identification of potentially serious health

problems." (Doc. 1 ¶ 12, 14.) Once a Healthprint is created for a client, Superior recommends various supplements and lifestyle changes. (*Id.*)

Superior has registered the mark "Healthprint" twice with the United States Patent and Trademark Office ("USPTO"). Registration number 2646571 was obtained on November 5, 2002, and registration number 2928465 was obtained on March 1, 2005. (Doc. 20 ¶¶ 14, 16.) The USPTO did not require proof of a secondary meaning for either mark. (*Id.* ¶ 18.) On November 8, 2008, and February 5, 2011, Superior filed declarations of incontestability for the marks. (Doc. 1 ¶¶ 26, 31.)

On June 8, 2016, Shaklee, a corporation that manufactures and distributes nutrition supplements, beauty products, and household-cleaning products, filed a trademark application with the USPTO claiming a similar "Healthprint" mark. (*Id.* ¶ 28.) Shaklee's Healthprint refers to a free, online survey that consists of twenty-two questions about a client's personal characteristics, habits, and goals.[1] (Doc. 43-8 ¶ 13.) Once the client answers all of the questions, he or she is

---

[1] The questions are:

(1) What is your age?; (2) What is your gender?; (3) What is your weight and height?; (4) How is your energy level on a normal day?; (5) How often do you get stressed?; (6) How do you sleep?; (7) How is your memory and concentration?; (8) How often do you exercise each week?; (9) How would you describe your weekly exercise?; (10) Do any of your cleaning products contain bleach or ammonia?; (11) How many times per week do you eat fruit?; (12) How many times per week do you eat vegetables?; (13) How many times per week do you eat whole grains?; (14) How many times per week do you eat dairy?; (15) How many times per week do you eat omega-3-rich fish, such as salmon?; (16) How many 8-ounce glasses of water do you drink each day?; (17) How many times per week do you consume sugary drinks (ex. soda, juices, etc.)?; (18) How many times per week do you eat unhealthy snacks or fast food?; (19) What do you typically eat for breakfast?; (20) Do you purchase organic foods?; (21) Do you have any dietary restrictions?; and (22) How much would you spend each day to achieve your optimum health?

Doc. 43-8 ¶ 13.

presented with "a customized set of Shaklee products that fits [his or her] health goals, needs and budget." (Doc. 43-7, Ex. 1 at 1.)

On November 1, 2016, Superior filed the current action for injunctive relief under the Lanham Act, 15 U.S.C. § 1114, *et seq.* In short, Superior alleges that Shaklee has infringed on its Healthprint trademark when Shaklee began offering its twenty-two question Healthprint survey. On December 20, 2016, Superior filed its Motion for a Preliminary Injunction. (Doc. 19.) Shaklee filed its response on January 20, 2017, and the Court heard oral argument on February 6, 2017.

**II.     Legal Standard**

A preliminary injunction is an "extraordinary and drastic remedy" and should not be granted unless the movant clearly satisfies its burden of persuasion as to four prerequisites: (1) a substantial likelihood of success on the merits of its claim at trial; (2) a substantial threat of irreparable harm to the movant if injunctive relief is denied; (3) the injury to the movant outweighs the potential harm that an injunction may cause the defendant; and (4) an injunction will not disserve the public interest. *Forsyth Cty. v. U.S. Army Corps of Eng'rs*, 633 F.3d 1032, 1039 (11th Cir. 2011) (quoting *ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009)); *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246–47 (11th Cir. 2002).

**III.    Substantial Likelihood of Success on the Merits**

Under the Lanham Act, a defendant is liable for trademark infringement if he uses "in commerce" and without consent, "any reproduction, counterfeit, copy, or colorable imitation of a registered mark" which "is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). Thus, to prevail on an infringement claim a plaintiff must show that (1) it owns a valid and protectable mark, and (2) the defendant's use of the mark is likely to cause confusion.

*Custom Mfg. & Eng'g, Inc. v. Midways Servs., Inc.*, 508 F.3d 641, 773 (11th Cir. 2007). Thus, Superior's success depends on whether Healthprint is a protectable mark, and if so, whether Shaklee's use of the mark is likely to cause confusion.

### A. Validity of the Mark

To prevail, Superior must first establish that its marks are valid and subject to protection. Trademark protection "is only available to distinctive marks, that is, marks that serve the purpose of identifying the source of the goods or services." *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 654 F.3d 1179, 1188 (11th Cir. 2011) (quoting *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1357 (11th Cir. 2007)). "Some marks are inherently distinctive; some marks, though not inherently distinctive, acquire distinctiveness by becoming associated in the minds of the public with the products or services offered by the proprietor of the mark; and some marks can never become distinctive." *Forman*, 509 F.3d at 1357 (citations omitted).

Registration of a trademark on the principal register of the USPTO is prima facie evidence of a mark's validity and establishes a presumption that the mark is distinctive. 15 U.S.C. § 1057(b); *Forman*, 509 F.3d at 1357 n.3. Here, Superior has proffered the USPTO's prosecution record as proof of registration of both of its Healthprint marks, and Shaklee has made no effort to rebut the validity of Superior's marks. Therefore, the marks are very likely valid.

### B. Likeliness of Confusion

Courts in the Eleventh Circuit consider the overall balance of the following factors when determining whether a likelihood of confusion exists: (1) the type of mark; (2) the similarity of the mark; (3) the similarity of products; (4) the similarity of retail outlets and customers; (5) the similarity of advertising media; (6) the defendant's intent; and (7) actual confusion. *Id.*; *Midway*

*Servs., Inc.*, 508 F.3d at 649–50 (citations omitted). "Of these, the type of mark and the evidence of actual confusion are most important." *Frehling Enters.*, 192 F.3d at 1335.

### 1. Type of Mark

The strength or type of a mark is determined by its level of distinctiveness and the degree to which third parties make use of it. *Frehling Enters.*, 192 F.3d at 1335 (citation omitted). There are four different gradations of distinctiveness which are listed as follows in descending order of strength: (1) arbitrary or fanciful; (2) suggestive; (3) descriptive; and (4) generic. *Knights Armament*, 654 F.3d at 1188. "The demarcation between each category is more blurred than it is definite." *Saint Luke's Cataract & Laster Inst., P.A. v. Sanderson*, 573 F.3d 1186, 1208 (11th Cir. 2009).

An arbitrary or fanciful mark bears no logical relationship to the product it represents. *Forman*, 509 F.3d at 1357. A suggestive mark "refers to some characteristic of the goods, but requires a leap of imagination to get from the mark to the product." *Id.* at 1357–58. Marks that are arbitrary, fanciful, or suggestive are considered "inherently distinctive" because "their intrinsic nature serves to identify a particular source." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).

A descriptive mark identifies a characteristic or quality of an article or service—for example "vision center" denoting an eyeglass shop. *Frehling Enters.*, 192 F.3d at 1335. Unlike an arbitrary, fanciful, or suggestive mark, a descriptive mark is not inherently distinctive and receives protection only if it acquires a secondary meaning. *Coach Auto. Liquidators, Inc. v. Premier Chrysler, Jeep, Dodge, LLC*, 605 F.3d 931, 938 (11th Cir. 2010). The final and weakest type of mark is a generic one. A generic mark describes the class to which the good belongs, and is entitled to no protection. *Frehling Enters.*, 192 F.3d at 1335.

As stated earlier, a trademark is presumed distinctive if it is registered on the USPTO's principal register. But, the level of distinctiveness presumed "depends on whether or not the [USPTO] has required proof of secondary meaning." *Forman*, 509 F.3d at 1357 n.3. If proof of a secondary meaning is not required during registration, the mark is presumed inherently distinctive. *Id.* Here, Superior has presented evidence that the USPTO placed both of Superior's Healthprint marks on the principal register without requiring proof of a secondary meaning. (Doc. 22 ¶ 7.) Therefore, Superior's marks are presumed inherently distinctive and, thus, at least suggestive. And Shaklee bears the burden to prove otherwise.

Shaklee argues that the Healthprint mark is more descriptive than suggestive "as it describes in part a characteristic of the service/product offered, namely a printout of blood test results." (Doc. 43 at 10 n.6.) Shaklee's argument is persuasive. A consumer might read the word Healthprint and conclude that the product or service offered is a printout giving the details of one's health, which appears to be exactly what Superior offers. Indeed, while not part of the registered mark, the mark often appears alongside the image of a fingerprint. Such an image placed closely to the mark would likely lead a consumer to conclude that, like a fingerprint, a Healthprint is some set of unique, identifying information, but related to one's health instead of a finger.

Next, Shaklee argues that Superior's mark "has been weakened due to its use by third parties in a variety of health-related contexts." (Doc. 43 at 10.) To bolster its argument, Shaklee lists many different entities that use the word "Healthprint" in various different enterprises, and lists other registered trademarks that contain the words "health" and "print" separately. (*Id.*) This evidence of third-party usage along with the descriptive quality of the mark leads the Court to conclude that Superior's marks are likely somewhat strong, lying somewhere between suggestive and descriptive.

### 2. Similarity of the Marks

The next factor considered when evaluating the likelihood of confusion is the similarity of the marks. A court measures the degree of similarity by comparing the marks at issue and considering the overall impressions that the marks create, including the sound, appearance, and manner in which they are used. *Frehling Enters.*, 192 F.3d at 1337. The more similar the marks, the more likely that a reasonable consumer will be confused as to the source of the product that each mark represents. *Id.*

Here, the marks are indisputably similar. Both marks use the word "Healthprint," and both marks are commonly paired with the image of a fingerprint. Indeed, the only differences between the marks appear to be the use of different fonts, and the use of all capital letters in Shaklee's mark, whereas Superior's mark is spelled only with a capital "H" and "P." (*See* Doc. 19 at 11.) Given how similar the marks appear, the Court concludes that this factor weighs in favor of Superior.

### 3. Similarity of Services

The test for this factor is not whether the goods can be distinguished by consumers, but "whether the goods are so related in the minds of consumers that they get the sense that a single producer is likely to put out both goods." *Frehling Enters.*, 192 F.3d at 1338 (citing *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1530 (1985)). "The greater the similarity between the products and services, the greater the likelihood of confusion." *E. Remy Martin & Co., S.A.*, 756 F.2d at 1530 (citation omitted).

As stated above, Superior's Healthprint is built from "a combination of laboratory tests and a series of written questions," and "centers around the principle that 'normal' blood test scores are not good enough to assist persons with the early identification of potentially serious health

problems." (Doc. 1 ¶ 12, 14.) Superior provides different levels of blood tests ranging from the "Basic HealthPrint" at $474 to the "HealthPrint Platinum" at $1,462. (Doc. 43-4 at 2.) As the record currently stands, it is unclear whether the blood tests are required to build a Healthprint profile. Cullen declares that "[b]lood testing services are not required for a consumer to begin creating his or her Healthprint with Superior" and provides a survey called a "master symptom tracker" that supposedly illustrates this. (Doc. 46 ¶ 12.) Superior has also provided the affidavit of one of its clients declaring that she has used Superior's Healthprint services without blood testing for years. (Doc. 47.)

But the USPTO prosecution history files for both of Superior's marks clearly show that blood testing is central to Superior's Healthprint—the '465 mark's file explicitly states that "HealthPrint **requires** a blood draw at one of thousands of participating collection sites." (Doc. 22-2 at 2, 11 (emphasis supplied); *see also* Doc. 22-1 at 37, 82, 87, 89.) Further, it seems unlikely that merely answering a set of questions without an accompanying blood test would result in a profile "customized to a client's unique biochemistry" as Superior claims its Healthprint provides. (Doc. 20 ¶ 15.) Once a Healthprint is created for a client, Superior recommends various supplements and lifestyle changes. (Doc. 46 ¶ 12.)

In contrast, Shaklee's Healthprint refers to a free, online survey that consists of twenty-two questions about a client's personal characteristics, habits, and goals. (Doc. 43-8 ¶ 13.) Once a client answers all of the questions, he or she is presented with "a customized set of Shaklee products that fits [his or her] health goals, needs and budget." (Doc. 43-7, Ex. 1 at 1.)

On the current record, it is unlikely that Superior's expensive, time-consuming, and invasive Healthprint and Shaklee's free, twenty-two question, and web-based survey would be "so related in the minds of consumers that they get the sense that a single producer is likely to put out

both goods." *Frehling Enters.*, 192 F.3d at 1338 (citing *E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc.*, 756 F.2d 1525, 1530 (1985)). Thus, Superior has not shown that it is likely to prevail on this factor.

### 4. Similarity of Customers and Retail Outlets

The fourth factor requires consideration of where, how, and to whom the parties' products are sold. *Frehling Enters.*, 192 F.3d at 1339. "Dissimilarities between the manner of sale and the typical customers of the parties' services lessen the possibility of confusion." *Fla. Int'l Univ. Bd. Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1261 (11th Cir. 2016). A plaintiff is not required to produce evidence of direct competition between the parties to favor a likelihood of confusion, but some degree of overlap between the parties' retail outlets and customer bases should be present. *Id.*

It appears that the parties' customers overlap. Cullen trains Shaklee distributors who often refer their clients—i.e., Shaklee's clients—to Superior's Healthprint services. (Doc. 19 at 15.) Indeed, Superior claims that more than 1,100 of Shaklee's clients have purchased Healthprint services from Superior. (Doc. 19 at 3.)

Turning to retail outlets or trade channels, Superior's primary argument is that both parties use Shaklee's distributors as a trade channel. Superior notes that it and Shaklee formed a symbiotic, commercial relationship when Cullen began training Shaklee distributors. Eventually, Shaklee distributors began referring their clients to Cullen, and, in turn, Cullen recommended Shaklee supplements. (Doc. 19 at 4–5.) Thus, the alleged overlapping "retail outlet" is Shaklee's own distributor network.

Shaklee argues that any overlapping customers or "retail outlets" of the parties should be disregarded because Superior's typical Healthprint clients are those willing to pay thousands of

dollars on blood work, whereas Shaklee's Healthprint clients are those who complete a free, ten-minute questionnaire to obtain product recommendations. Thus, the parties do not "cater to the same general kinds of individuals." *Fla. Nat'l Univ.*, 830 F.3d at 1262 (citing *Safeway Stores, Inc. v. Safeway Discount Drugs, Inc.*, 675 F.2d 1160, 1166 (11th Cir. 1982)).

Shaklee's argument is persuasive, especially considering that the "overlap" does not represent competition for the same clients, but rather, Superior's prospective clients *are already* Shaklee's. Therefore, this factor is neutral.

### 5. Similarity of Advertising Media

Courts are also required to compare the parties' advertisements and the audiences they reach. *Fla. Nat'l Univ.*, 830 F.3d at 1262 (citation omitted). "The greater the similarity, the greater the likelihood of confusion." *Id.* "[T]he standard is whether there is likely to be significant enough overlap in the [audience of advertisements] that a possibility of confusion could result." *Frehling Enters.*, 192 F.3d at 1340.

Here, both parties use word-of-mouth,[2] their websites, television, and various social media networks to market their respective Healthprints. (Doc. 19 at 14; Doc. 43 at 18.) While the types of media used by the parties overlap, the only evidence provided by Superior that the *audience* overlaps is the word-of-mouth advertising though Shaklee's distributor network. Nevertheless, the Court finds that this factor weighs slightly in favor of a likelihood of confusion.

### 6. Shaklee's Intent

"If it can be shown that a defendant adopted a plaintiff's mark with the intention of deriving a benefit from the plaintiff's business reputation, this fact alone may be enough to justify

---

[2] At this stage in the action, it is unclear how Shaklee's distributor network functions. Presumably, much of it is face-to-face marketing and sales pitches—i.e., word of mouth.

the inference that there is confusing similarity." *Fla. Nat'l Univ.*, 830 F.3d at 1263 (quoting *Frehling Enters.*, 192 F.3d at 1340). To weigh this factor, courts must determine whether the defendant "had a conscious intent to capitalize on the plaintiff's business reputation, was intentionally blind, or otherwise manifested improper intent" when it adopted its mark. *Midway Servs., Inc.*, 508 F.3d at 648 (quotations and alteration omitted).

Superior, again, points to the symbiotic relationship Cullen developed with Shaklee as evidence of Superior's improper intent. Specifically, Superior points to correspondence exchanged by the parties that led to a meeting in 2005 as evidence of Shaklee's intent to capitalize on Superior's business reputation. On February 29, 2005, Cullen received an email from Shaklee requesting literature and information about specific nutritional regimens Superior provided to Shaklee clients. (Doc. 20 ¶ 23.) Cullen responded by sending "significant research information and educational materials concerning Healthprint to Shaklee." *Id.* In a subsequent conference call between Cullen and Shaklee representatives, Cullen avers that Healthprint was discussed in detail. (*Id.* ¶ 21.) Superior alleges that Shaklee used the proprietary information it gained from Cullen during this meeting to develop its Healthprint. Superior also argues that Shaklee's use of its mark near a fingerprint, just like Superior, if further evidence of Shaklee's improper intent.

Shaklee counters, arguing that the purpose of the meeting was not to discuss Healthprint, but was to express Shaklee's concern that Cullen may have been practicing medicine without a license and "illegally using her relationships with Shaklee distributors to prescribe supplements to treat disease, thereby creating potential legal liability for Shaklee." (Doc. 43 at 6.) Further, Shaklee contends that its decision to use "Healthprint" was driven by informal consumer testing where consumers selected from seven potential names. (Doc. 43-16 ¶ 5.)

Given Shaklee's description of how it selected the word "Healthprint" for its services and the disagreement as to what actually happened in the 2005 meeting between the parties, it is unlikely that Superior can demonstrate that Shaklee acted intending to benefit from Superior's reputation. This conclusion is further supported by the fact Shaklee only began developing its Healthprint in the summer of 2016, nearly eleven years after it was allegedly given information about Superior's Healthprint at the 2005 meeting. (*Id.* ¶ 3.)

### 7. Actual Confusion

"Evidence of confusion by actual or potential customers is, of course, the best evidence of a likelihood of confusion." *Fla. Nat'l Univ.*, 830 F.3d at 1264 (citing *Frehling Enters.*, 192 F.3d at 1240). When "assessing the weight of evidence of actual confusion, [courts] must consider <u>who</u> was confused and <u>how</u> they were confused: 'Short-lived confusion or confusion of individuals casually acquainted with a business is worthy of little weight, . . . while confusion of actual customers of a business is worthy of substantial weight.'" *Id.* (emphasis in original) (quoting *Safeway Stores*, 675 F.2d at 1167). Essentially, this factor depends on whether "the right people were confused in the right way." *Id.*

In this case, Superior has submitted the affidavits of four of its clients (Doc. 35, 36, 38, 39), two of its employees (Doc. 37, 40), and one potential client (Doc. 35) as evidence of actual confusion. Two of Superior's actual clients ("clients one and two") aver that they have used Superior's Healthprint in the past, but, upon learning of Shaklee's Healthprint, began wondering which service better suited them. But neither appears confused as to who provides each service. (Doc. 36 ¶ 8; Doc. 38 ¶ 8.)

Another client ("client three") was initially concerned that Superior had been purchased, but now only appears to be confused as to who owns the right to the Healthprint trademark—not

- 12 -

who provides which services. (Doc. 39 ¶¶ 6, 8.) This short-lived confusion is worthy of little weight. *Fla. Nat'l Univ.*, 830 F.3d at 1264. The final Superior client ("client four") assumed that the parties had merged after hearing about Shaklee's Healthprint and is now confused as to which party provides "the Healthprint service [he has] used for so many years." (Doc. 34 ¶¶ 5–6.)

Superior's potential client compared the two Healthprint assessments and decided that she would first try Shaklee's service because it was cheaper. If Shaklee's assessment was insufficient, she would consider Superior's. (Doc. 35 ¶ 7–8.) She does not appear to be confused at all as to which service is which.

Finally, the two employees generally aver that they have received letters, emails, and phone calls from clients wondering if Superior would still offer Healthprint, inquiring whether Shaklee purchased Superior, or seeking a breakdown of the differences between the services. (Doc. 37 ¶ 8; Doc. 40 ¶ 19.) But none of the emails or letters have been provided to the court.

Of all these affidavits, there is only one example of a client or potential client who is the "right person confused in the right way." *Fla. Nat'l Univ.*, 830 F.3d at 1264. Client four is an actual customer of Superior's who is confused as to which Healthprint service is the one he is accustomed to. This single instance of actual confusion is worthy of some consideration, but not much. *See Safeway Stores*, 675 F.2d at 1167 ("[C]ourts . . . have disparaged the significance of evidence of confusion of less than fifteen individuals over three years; of three individuals over fifteen years; and of two individuals.").

### 8. Is There a Likelihood of Confusion?

Summarizing the seven factors analyzed above, Superior's mark is somewhat strong, lying somewhere between suggestive and descriptive. The marks are very similar, but the services provided are not. The parties share similar retail outlets, client bases, and advertising media, but

their typical clients differ. Superior failed to demonstrate that Shaklee acted with an improper intent, and proffered very little concrete evidence of actual confusion. On balance, and given that a preliminary injunction is an extraordinary and drastic remedy, the Court finds that Superior has failed to establish the likelihood of confusion between the use of these marks.

**IV.  Conclusion**

Superior has shown that its Healthprint marks are valid, but failed to show that Shaklee's competing mark presents a likelihood of confusion. Thus, Superior has failed to show a likelihood of success on the merits of its infringement claim and it is, therefore,

**ORDERED** that Superior's Motion for a Preliminary Injunction (Doc. 19) is **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on February 21, 2017.

_____
GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party