# EXPERT REPORT OF HAL PORET IN MATTER OF SUPERIOR CONSULTING SERVICES, INC. V. SHAKLEE CORPORATION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## (1) SURVEY TO DETERMINE IF SHAKLEE'S USE OF THE MARK HEALTHPRINT IN CONNECTION WITH ITS ONLINE HEALTH RECOMMENDATION SERVICES CREATES A LIKELIHOOD OF CONFUSION WITH RESPECT TO SUPERIOR'S HEALTHPRINT BLOOD ANALYSIS SERVICES

## (2) ANALYSIS OF SURVEY OF KIRK MARTENSEN

REPORT PREPARED FOR:
Smolker, Bartlett, Loeb, Hinds & Sheppard, P.A.

PREPARED BY:
Hal Poret
142 Hunter Ave
Sleepy Hollow, NY 10591

November 2017

## *TABLE OF CONTENTS*

| | Page # |
|---|---|
| BACKGROUND AND PURPOSE | 3 |
| STUDY AUTHORSHIP AND QUALIFICATIONS | 5 |
| **PORET SURVEY** | 7 |
| STUDY DESIGN | 7 |
| SUMMARY OF FINDINGS | 61 |
| METHODOLOGY | 63 |
| THE RELEVANT UNIVERSE OF INTEREST | 63 |
| SAMPLING PLAN | 64 |
| DATA PROCESSING | 68 |
| INTERVIEWING PROCEDURES | 68 |
| DOUBLE-BLIND INTERVIEWING | 68 |
| INTERVIEWING PERIOD | 68 |
| QUALITY CONTROL | 68 |
| DETAILED FINDINGS | 72 |
| **ANALYSIS OF MARTENSEN SURVEY** | 78 |

THE FOLLOWING APPENDICES ARE PROVIDED SEPARATELY:
APPENDIX A:   CURRICULUM VITAE OF STUDY'S AUTHOR
APPENDIX B:   QUESTIONNAIRE
APPENDIX C:   SCREENSHOTS OF SURVEY
APPENDIX D:   SURVEY DATA FILE
APPENDIX E:   IMAGES USED IN SURVEY

## BACKGROUND AND PURPOSE

Superior Consulting Services, Inc d/b/a Your Future Health (YFH) offers blood testing and related customized nutrition analysis under the mark Healthprint.

Shaklee Corporation (Shaklee) offers an online personalized supplement recommendation service under the mark HEALTHPRINT.

YFH has filed a lawsuit against Shaklee alleging that Shaklee's use of the mark HEALTHPRINT in connection with Shaklee's services creates a likelihood of confusion with respect to YFH's Healthprint services.

Smolker, Bartlett, Loeb, Hinds & Sheppard, P.A., counsel for Shaklee, retained me to design and conduct a survey to determine whether Shaklee's use of the mark HEALTHPRINT in connection with its services creates a likelihood of confusion with respect to YFH's Healthprint services.[1]  I was also asked to review and provide my opinions regarding the Expert Report of Kirk Martensen, concerning a survey Mr. Martensen conducted based on which he opines that there is a likelihood of confusion.

This report describes the methodology, execution and results of my survey, and my opinions regarding the Martensen Report and Survey.  As described in detail below, the data from my survey supports a finding that there is not a likelihood of confusion.  As also discussed below, the Martensen Survey fails to comply with any of the most fundamental standards of confusion survey research, including that it: (1) failed to show any of the marks as they are actually used in the marketplace, instead inserting the bare term "Healthprint" into question wording; (2) failed to conform to any

---

[1] YFH's Complaint contains a number of allegations relating specifically to Shaklee distributors. This survey was designed to assess whether end consumers of the parties' services are likely to be confused based on the parties' use of their respective marks.  The survey did not cover distributors of Shaklee or YFH products or services.

accepted methodology for measuring confusion, instead asking questions that do not in any way test whether consumers are confused by Shaklee's use of its mark; (3) failed to use a Control Group or a control of any kind; and (4) failed to survey the relevant universe – i.e. prospective purchasers of either of the relevant services with which the marks are used.  These and other flaws discussed below render the survey entirely valueless and unreliable.

In connection with designing my survey and preparing this report I reviewed the following materials in addition to those cited in the body of the report:  (1) First Amended Complaint; (2) Shaklee website; (3) YFH website; (4) other websites advertising health-related products and services; (5) Martensen Report; (6) Martensen deposition with exhibits; and (7) Carol Guth deposition.  The fee charged for my survey is $50,000.  This includes the fees paid to outside vendors I used to conduct the surveys.  For any additional work on this matter, including review, analysis, and reporting on the Martensen Report and Survey, I am being compensated at my ordinary hourly rate of $625.  My fees are not contingent on the nature of my opinions or the outcome of the litigation.

## AUTHORSHIP AND QUALIFICATIONS

This report was prepared by, and the study discussed here in was designed, supervised, and implemented by Hal L. Poret, President at Hal Poret, LLC.

I have personally designed, supervised, and implemented over 1,000 surveys regarding the perceptions and opinions of consumers.  Over 300 have involved consumer perception with respect to trademarks, and over 300 have been conducted online.  I have personally designed numerous studies that have been admitted as evidence in legal proceedings and I have been accepted as an expert in survey research on numerous occasions by U.S. District Courts, the Trademark Trial and Appeal Board, the FTC, and the National Advertising Division of the Council of Better Business Bureaus (NAD).

I am a member of the American Association of Public Opinion Research, publisher of *Public Opinion Quarterly* and the *Journal of Survey Statistics and Methodology*, the International Trademark Association, and the National Advertising Division of the Council of Better Business Bureaus (NAD).  I routinely conduct market research surveys for a variety of small to large corporations and organizations.

I have frequently spoken at major intellectual property and legal conferences on the topic of how to design and conduct surveys that meet legal evidentiary standards for reliability, including conferences held by the International Trademark Association (INTA), American Intellectual Property Law Association, Practicing Law Institute, Managing Intellectual Property, Promotions Marketing Association, American Conference Institute, and various bar organizations.

In addition to my survey research experience, I hold bachelors and masters degrees in mathematics and a J.D. from Harvard Law School.  Additional biographical material, including lists of testimony and publications, is provided in Appendix A.

# *PORET SURVEY*

## *STUDY DESIGN*

This survey was conducted online.  A total of 400 respondents participated in this online survey among prospective consumers of YFH's Healthprint services – i.e. prospective consumers of blood-testing services or products for analyzing nutritional needs.[2]  This was the core definition of the universe because the senior user's prospective consumers are the accepted universe for assessing likelihood of reverse confusion.  As discussed below, the majority of respondents were also prospective consumers of Shaklee's Healthprint services, so the survey also contained a large sample of respondents that are representative of the relevant universe for assessing forward confusion – namely, prospective consumers of the allegedly infringing services from the junior user.

This survey utilized a version of a "Squirt" Survey known as a Sequential Lineup survey.  "Squirt" commonly refers to the type of survey where <u>both</u> parties' uses of their respective marks are shown and asked about in the survey, as opposed to a survey where only one of the parties' uses is shown and respondents are questioned to see if they name the other party on their own.[3]  The Sequential Lineup survey is a form of Squirt Survey that replicates a common marketplace scenario in which consumers are first exposed to one company's products or services and are then subsequently exposed to another company's products or services.  McCarthy describes this methodology as accomplishing the following: "This is an attempt to replicate the marketplace process of

---

[2] See the Sampling section of this report for more information regarding who qualified for and completed the survey.
[3] Mr. Martensen's Report endorses the Squirt format as appropriate for this case.

advertising exposure to a brand or trade dress, followed by being confronted in the market with both similar and differing brands or trade dresses."[4]

The Sequential Lineup survey is a standard and well-accepted method for assessing likelihood of confusion in situations where the parties' products or services are sufficiently overlapping such that consumers would be reasonably likely to encounter both in close proximity in the marketplace. A Squirt Survey properly replicates realistic marketplace conditions in such instances by presenting the parties' products/marks in close proximity in the survey.

Although the parties' services are different and are not directly competitive, there is at least a superficial connection in that both of the parties' services relate generally to health. In addition, YFH alleges that there have been instances in which the same consumers have been exposed to both Shaklee and YFH services through common channels, such as through distributors. Accordingly, giving the benefit of the doubt to YFH's allegations, I adopted the Sequential Lineup methodology, which assumes a reasonable probability of consumers encountering both parties' services. Using the Sequential Lineup format in the circumstances of the present dispute benefits YFH by maximizing the survey's ability to detect any potential confusion, because <u>all</u> respondents are exposed to <u>both</u> the Shaklee Healthprint service and the YFH Healthprint service and are directly asked about a potential connection between the services.

Another advantage of the Sequential Lineup survey is that it also adequately addresses the potential for both reverse and forward confusion. Since the survey shows both the Shaklee Healthprint services and the YFH Healthprint services in close proximity and directly asks about a connection, it is informative as to whether consumers are likely to

---

[4] 1 McCarthy, J. Thomas. McCarthy on Trademarks and Unfair Competition, Fourth Edition, Volume 5, 32:177, page 32-291. 2001.

make a mistaken connection due to the marks regardless of the order they are encountered. Although the order in which the products are presented in the survey – first the Shaklee service and then the YFH service – is technically modelled on reverse confusion (where the consumer is first exposed to the junior user's mark and then subsequently the senior user's mark), the survey is also probative as to forward confusion because the likelihood of the respondents confusing the services when shown both in close temporal proximity should not hinge on the order in which they are presented.

While a Sequential Lineup survey is a standard and well-accepted survey format in appropriate situations, it is also well-known to contain a degree of inherent suggestiveness due to the fact that it presents both parties' marks in close proximity and asks questions that suggest the potential for a connection.[5] Due to this format, respondents may look for a potential commonality between the parties and may make connections based on superficial similarities that would not be likely to cause confusion in the actual marketplace. This phenomenon is typically referred to as survey "noise" or a "false positive" rate and must be controlled for. The most common form of a control for this type of survey is a control group, in which respondents take the identical survey with the sole exception that the allegedly infringing mark is replaced by a mark that is not confusingly similar.[6] The way to control for noise is to replace the

---

[5] This suggestiveness is not problematic in scenarios where the presentation of the products in close proximity in the actual marketplace itself suggests a potential connection to real consumers. In scenarios where real consumers are less likely to encounter the products in close proximity in the actual marketplace, the suggestiveness of the Lineup survey format may exceed the degree of suggestiveness present in the marketplace, making it even more important to control for the suggestiveness of the survey with an ideal control. In the present case, given the notable differences in the parties' services and how they are encountered, the concern over suggestiveness and the need for an ideal control is more acute.

[6] A Control Group in a survey is akin to a placebo group in a classic scientific experiment. When a Test Group is given a medication and questioned about its impact, a Control or Placebo Group is given a placebo and asked the same questions to assess the extent to which the same result ensues. A placebo is a pill that removes the active ingredient at issue but changes nothing else. If, for example, 30% of the Test Group responds that the medication helped their

allegedly infringing Shaklee Healthprint mark with an alternate mark that appropriately conveys the health-related nature of the service but is clearly not a confusingly similar term.  This control is discussed in detail below.

The survey included a Test Group (comprised of 200 unique respondents) and a separate Control Group (comprised of 200 unique respondents).

As this survey was conducted online, all the instructions and questions were displayed on respondents' computer screens and each question appeared on its own screen.

### Test Group

After a series of initial screening questions, respondents in the Test Group were prompted as follows:

> The remaining part of the survey has three sections.  For the first section, we are going to show you several screens from a website.
>
> Please review the website as you would if you were considering using the service you will see on the coming screens.

Respondents were then further instructed:

> Below is a page from the website.  Please take your time to review it and scroll up and down as necessary to review the full page.

---

headache, the Control Group must be consulted to determine the extent to which, if at all, this result can be reliably attributed to the effectiveness of the active ingredient.  If 25% to 30% of the Control Group reports that the medication (placebo) helped their headache, we know that the 30% Test Group result cannot be attributed to the effectiveness of the test medication, as those given the placebo had a very similar result.  If, on the other hand, only 10% of the Control Group reports a benefit, we know that the 20% difference between the Test result (30%) and the Control result (10%) must reflect the genuine impact of the test medication.  The same experimental design (comparing Test and Control Groups) is commonly used in surveys to isolate the impact of the "active ingredient" (in this case, the Healthprint mark) and weed out the impact of any other factors.

Beneath this instruction, respondents saw the following webpage image:[7]



---

[7] This image has been reduced in size and split across two pages in order to appear in this report. In the actual survey, this and all other images, appeared large across respondents' screens, as a webpage would typically appear. Screenshots of how the survey appeared to respondents are provided in Appendix C of this report. The actual images used for programming the survey are provided in Appendix E.



Everything we do has been designed In Harmony with Nature™.

### SAFE

Our product ingredients are carefully selected to meet our high performance and screening standards, often surpassing the standards of the USP, a scientific, nonprofit organization that sets federally recognized public standards of quality for medicines, dietary supplements, and foods.

### PROVEN

Our products are backed by 71 patents and patents-pending and over 120 published scientific papers and presentations that show our products make a difference in your health.

### GUARANTEED

We believe in the safety and performance of all our products. That's why we stand behind every single one with a 100% guarantee or your money back. No questions asked. That's The Shaklee Difference.

*All trademarks of the publications above are the property of their respective owners and are used only to identify media outlets featuring Healthprint™



After fifteen seconds elapsed, the following instruction appeared beneath the image:

Before continuing with the survey, please indicate whether or not you were able to view the webpage clearly.

• I viewed the webpage clearly

- I was unable to view the webpage clearly

Respondents viewed the image for a minimum of fifteen seconds and confirmed they were able to view the image clearly before continuing to the next screen. This is a standard quality control procedure that ensured respondents spent enough time reviewing the image in order to meaningfully participate in the survey.

On the next screen, respondents were further prompted:

> On the next screen you will be shown a number of additional pages that a customer would see on the website as they answer questions and provide information the website asks for. (You will not be asked to enter any information, only to view the screens.)
>
> You will need to click the green arrows to the side of each page to view all pages before you can continue with the survey. You may scroll back and forth to view each page on the website as many times as you like.
>
> Please take your time to view the pages as you ordinarily would if you were considering using the service offered on the website.

Respondents were then instructed:

> Please use the green arrows to advance to view 12 pages from the website.

Beneath this instruction respondents saw the first of twelve images of the Shaklee website featuring the HEALTHPRINT mark at issue. Respondents saw each image one at a time, starting with the following image:



Respondents then clicked an arrow to the right of the image to scroll to the second image:



Respondents then clicked an arrow to the right of the image to scroll to the third image:



Respondents then clicked an arrow to the right of the image to scroll to the fourth image:



Respondents then clicked an arrow to the right of the image to scroll to the fifth image:



Respondents then clicked an arrow to the right of the image to scroll to the sixth image:



Respondents then clicked an arrow to the right of the image to scroll to the seventh image:



Respondents then clicked an arrow to the right of the image to scroll to the eighth image:



Respondents then clicked an arrow to the right of the image to scroll to the ninth image:



Respondents then clicked an arrow to the right of the image to scroll to the tenth image:



Respondents then clicked an arrow to the right of the image to scroll to the eleventh image:



Respondents then clicked an arrow to the right of the image to scroll to the twelfth and final image:



Respondents could scroll back and forth between these images as many times as they desired. Once all twelve images had been viewed, then the following instruction appeared on screen beneath the images:

> Before continuing with the survey, please indicate whether or not you were able to view all of the webpages clearly.

- I viewed all the webpages clearly
- I was unable to view all the webpages clearly

Respondents were required to view all twelve images and confirm they were able to view each clearly before continuing to the next screen.  This standard quality control procedure ensured respondents spent enough time reviewing the images in order to meaningfully participate in the survey.

On the next screen, respondents were then shown one more webpage:

Below is the page on which you can purchase services offered on the website. Please take your time to review it and scroll up and down as necessary to review the full page.

Beneath this instruction respondents saw the following image: [8]

---

[8] This image has been reduced in size and split across two pages in order to appear in this report. In the actual survey, this and all other images, appeared large across respondents' screens, as a webpage would typically appear. Screenshots of how the survey appeared to respondents are provided in Appendix C of this report. The actual images used for programming the survey are provided in Appendix E.





Shaklee Corporation [US] https://www.shaklee.com/

Shaklee

HEALTHPRINT™

Your HEALTHPRINT™ Summary and Recommendations

YOUR HEALTH ASSESSMENT PRODUCT RECOMMENDATIONS YOUR ANSWERS

## Your Healthprint diet score of 54 shows you're heading in the right direction.

54

0 100

It looks like you've already started making choices that can lead to positive changes in your health. Based on your responses, here are some things you can do to take the next step in improving your diet:

- Omega-3 fatty acids are an important part of a healthy diet. You can meet this need by eating fish or by consuming high-quality omega-3 supplements.
- A great way to improve your diet is to eat to 2-3 servings of fruit every day.
- Eat your veggies! Begin to improve your diet by eating at least three servings of vegetables every day.

READ MORE

## Your Healthprint lifestyle score of 71 shows you want to keep moving.

71

0 100

You're doing a lot of things right by making exercise, sleep, and stress reduction a priority. Here are a few things you can do to build on your healthy lifestyle choices based on your health assessment:

- For busy people especially, it's important to make time for self-care because stress can have long-term health impacts.
- Regular physical activity of at least 2-5 hours a week is recommended, unless medical conditions preclude it.
- If you occasionally need help with sleep, some simple tweaks to your bedtime habits and diet can help.

READ MORE

23.7 BMI

Body Mass Index (BMI) is a universally recognized measure of body composition based on height and weight. Based on the answers you provided, your BMI is 23.7. According to the World Health Organization, you are in the normal range for BMI. Keeping your weight under 183 pounds will keep you at a healthy weight. LEARN MORE

## Let's Take A Closer Look At **Your Top Health Goals**

**Goal 1: Healthy Heart**

The heart is the hardest working organ in the body, so it deserves special attention. As you learn about your particular risk factors, there are many steps you can take to pro... continue

**Goal 2: Weight Loss**

You are not alone in having a concern about your weight, and there are right and wrong ways to address it. We don't believe in miracle cures. Take that first step and remember... continue

**Goal 3: Immune Support**

Your immune system is an incredibly complex network that must function 24/7 to protect your health. Your diet may be lacking in nutrients critical to optimal immune function. ... continue

## Next, See How the **Shaklee Difference** Can Help Achieve Your Goals

Shaklee 1956

Everything we do has been designed in Harmony with Nature™. Safe. Proven. Guaranteed.

- **Safe** – Our products undergo a screening process that surpasses even the standards of the United States Pharmacopeia. The USP only considers about 100 contaminants, but we screen for over 350 contaminants, pesticides and impurities on every new botanical ingredient.
- **Proven** - Our products are backed by 71 patents and patents-pending, over 120 published scientific papers and presentations, and the Landmark Study, one of the largest studies of long-term supplementation conducted by UC Berkeley. The study showed that Shaklee supplement users had markedly better health than non-supplement users.
- **Guaranteed** - We stand behind our products with a 100% money-back guarantee—no questions asked.

## Now, Choose From **3 Personalized Recommendations**

These recommendations are put together based on your results and top health goals. Each solution includes personalized product recommendations to give your body the nutrients and support it needs to achieve optimal health.

(Prices shown reflect 15% savings with Membership)

HEALTHPRINT™

**LIMITED TIME OFFER**
ON ADVANCED AND COMPREHENSIVE RECOMMENDATIONS

Receive a FREE Shaklee product to help support your top health goal when you purchase the ***ADVANCED*** or ***COMPREHENSIVE*** recommendations.

You'll also receive FREE shipping (up to $20) when you purchase the ***COMPREHENSIVE*** recommendation.

After fifteen seconds elapsed, respondents were instructed:

Before continuing with the survey, please indicate whether or not you were able to view the webpage clearly.

- I viewed the webpage clearly
- I am unable to view the webpage clearly

For quality assurance, respondents again confirmed they viewed the webpage clearly prior to continuing.

Exposing respondents to the above-detailed images from the Shaklee Healthprint website was a fair and realistic simulation of an actual consumer's encounter with Shaklee's use of the Healthprint mark, as well as the finger print symbol used in connection with the mark.  The pages shown to respondents included over **thirty** uses of the Healthprint mark, including "Healthprint" appearing both in the web address and on the body of the page on each image shown, and numerous times on the final page offering consumers the opportunity to purchase products or services.  This gave respondents a sufficient exposure to Shaklee's use of "Healthprint" so that the survey could properly measure the extent to which it might lead to confusion with respect to YFH's Healthprint service.  Showing these pages from the Shaklee Healthprint website was also appropriate since the website is the way in which prospective consumers would typically learn about and use the Shaklee "Healthprint" service.

Next, respondents were further instructed:

**PLEASE READ INSTRUCTION CAREFULLY**

This concludes the **first section** of the survey.

If later in the survey you are asked about the website you were shown in the <u>first section of the survey</u>, we are referring to the website that we just had you review.

In the next section respondents were asked a series of buffer questions. The purpose of these questions was to create a buffer period so that the Shaklee website and services would recede from immediate short-term memory prior to respondents being asked questions about the other companies included in the sequential lineup, including YFH's Healthprint services. This appropriately simulates a realistic marketplace situation in which consumers would encounter a particular product or service and then have at least some gap in time before encountering other services. Respondents were then given the following instruction along with the first of several buffer questions:

> For the <u>second section</u> of the survey, we would like to ask you a few brief questions relating to general health.
>
> Which of the following, if any, do you regularly do (during relevant times of the year)?
>
> *(Please select all that apply or none)*
>
> - Exercise/workout
> - Participate in organized sports
> - Take vitamins
> - Use sunscreen
> - Have an annual check-up with a physician
> - None of these

Followed by:

Through which of the following, if any, do you have health insurance?

*(Please select all that apply or none)*

- Your employer
- A family member's employer
- Private insurance (not through an employer)
- Medicare
- Medicaid
- None of these

Followed by:

Which of the following, if any, apply to you?

*(Please select all that apply or none)*

- Vegan
- Vegetarian
- Gluten-free
- Dairy-free
- Have food allergies
- Follows low carb diet
- None of these

And finally:

Do you or does anyone else in your household work in the area of health services or healthcare?

- Yes
- No

Respondents then moved on to the final section of the survey. First, respondents were prompted:

For the third and final section of the survey, you will be shown websites for several services. For each one website, you will need to click on green arrows to the side of the page to view three pages from the website. For each website, please look at the webpages as you would if you were considering using the advertised service.

You will be asked some questions about each website. For any question, if you do not have an opinion, please indicate so. Please do not guess.

Respondents were then shown images of three different health-related websites, one at a time and in randomized order. The three websites shown to respondents in this section of the survey included:

1) YFH webpages promoting YFH's Healthprint service
2) Nature's Sunshine, an unrelated third-party site which offers a health assessment service, and
3) Health Grades, another unrelated third-party site which provides information about healthcare providers.

Exposing respondents to the Shaklee website and then to a lineup consisting of the YFH website, the Nature's Sunshine website, and the Health Grades website is an appropriate way to simulate the experience of a consumer who encounters various health-related services. As in the actual marketplace, a consumer who is interested and involved in the marketplace for health-related services is reasonably likely to encounter various health-related services and not merely Shaklee and YFH. Including websites from two third-party sites appropriately simulates this real world context and aids in masking the purpose of the survey and reducing the suggestiveness of the survey by ensuring that respondents are not focused solely on a potential connection between Shaklee and YFH.

For each of the three websites, respondents saw three separate webpage images and were asked a series of questions.

While the order of the websites was randomized and thus varied from respondent to respondent, for the purpose of this report I am choosing to show the YFH website first, along with the corresponding question series.

Respondents were first instructed:

> Please review the three webpages from the following website and then answer the question that will appear below after you review the three pages.

Beneath this instruction, respondents saw the following image from the YFH website:



www.yourfuturehealth.com

**Your Future Health**

The premier blood testing and customized nutrition analysis company since 1976

1-877-468-6934

..Enhancing Your Future Health!

Helping All Ages Be Healthy!

Home    About Us    Why Test?    Products & Services    Testimonials    Ordering    Partnerships    Resources

**Blood Tests Explained**
CLICK HERE

**FAQs**

**Product Options:**

Basic HealthPrint
HealthPrint +
Omega 3 Profile +
Red Blood Cell Test
Comprehensive
Stool Analysis
Telomere Cell Age
Specialty Tests
Add On Tests
Test Only

**Why is YFH the Premier Blood Testing Company?**

*"Ellie's idea of testing your blood to know how to optimize your own nutrition--not anyone's else's--just makes sense. And it works."* Vicki Nassif, DDS

YFH uses its 40 year data base to compute your optimum range and determine your risk factors, NOT just tell you that your blood test scores are in the lab normal range. Early detection of disease (found by YFH's database) is the key to protecting your health.

*"Ellie shows that individuals have distinctive Personal Normal scores that are in a much more narrow range than the laboratory's "normals". This tool for early detection of disease is the key to preventing illness."* Dan C. Dantini, MD

YFH provides a blood test kit with: every tube labeled for accuracy, shipping materials, doctor order, draw site set up, and your blood results electronically fed from the exact equipment YFH stipulates. (Most blood test companies JUST provide the doctor's order.) Also, your blood test results are triple checked and scores can always be compared because YFH controls the test protocol and uses the best equipment each time. Extra serum is collected and frozen so you can be notified if additional tests are needed to clarify a suspicious score. FREE group telephone test explanations are held regularly.  In addition, YFH has a program for international orders (please call or email for details).

YFH's trained customer service representatives listen and help you choose the best group of tests for your budget. HealthPrint+ results include a 200 page guide and YFH's power foods list which  includes food and nutritional suggestions customized to your scores.  However, we do not sell supplements so there is no conflict of interest. Why not take control of your health today!

**YFH Critical Gut News**

Reviews

**Take the Tour of Our Services**

**Learn About Blood Testing**

**Audio/Web Conferences**

**YFH Clients on Nationwide TV**
YFH Clients on TV Nationwide
(Click Here)

**Order Now**
Order Now

It was appropriate and realistic to initially show respondents this page, as it is the home page of the YFH website and describes YFH's services generally.  It also contains three uses of the Healthprint mark by YFH.

After fifteen seconds elapsed, an arrow appeared to the right of the image which respondents then clicked to scroll to the second YFH image:



Showing this second page that is specifically focused on the Healthprint service and mentions the Healthprint mark many times in prominent fashion ensured that respondents were given a heavy exposure to the Healthprint mark as used by YFH.

After fifteen seconds elapsed, an arrow appeared to the right of the image which respondents then clicked to scroll to the final YFH image:



Showing this order page gave respondents exposure to three additional uses of the Healthprint mark in a realistic context in which the service can be ordered.

Ultimately, respondents viewed a total of three webpages from the YFH website that gave respondents many exposures to YFH's use of the Healthprint mark in a manner that fairly and realistically represents the way real consumers would see YFH's use of Healthprint if considering using YFH's services.  Using the YFH website as the means for exposing respondents to YFH's Healthprint mark was fair and appropriate, as it is my understanding that the YFH website is a typical means for learning about and ordering the YFH Healthprint service.  Accordingly, a typical prospective consumer of YFH's Healthprint service would visit the website and be exposed to the materials shown in the survey.

Respondents could scroll back and forth between these images as much as they desired. Once the third and final YFH image appeared on screen, respondents were asked the following question beneath image:

Do you think that the services offered on this website are from...[9]

- The <u>same</u> company as the website you were shown in the <u>first section</u> of the survey
- A <u>different</u> company than the website you were shown in the <u>first section</u> of the survey
- No opinion/don't know
- I am unable to view the webpages clearly

Respondents who answered that the services offered on the website are from the same

---

[9] To avoid response bias due to response option ordering, the order in which the first two options were shown was randomized. For all subsequent questions presented to a particular survey respondent, these response options then continued to be shown in the order in which they first appeared.

company as the website they were shown in the first section of the survey were then shown the YFH website image again[10] and asked:

> Please explain in as much detail as possible what makes you think that the services offered on this website are from the <u>same</u> company as the website you were shown in the <u>first section</u> of the survey?

Respondents could type in any answer.

Meanwhile, Respondents who previously answered either that the services offered on the website are from a different company than the website they were shown in the first section of the survey, or selected "no opinion/don't know," were shown the YFH website images again and asked the following question:

> Do you think the services offered on this website …[11]

- <u>are</u> affiliated with, or sponsored or approved by, the company whose website you were shown in the <u>first section</u> of the survey
- are <u>not</u> affiliated with, or sponsored or approved by, the company whose website you were shown in the <u>first section</u> of the survey
- No opinion/don't know
- I am unable to view the webpage clearly

Respondents who answered that the services offered on the website are affiliated with, or sponsored or approved by, the company whose website they were shown in the <u>first</u> section of the survey were then shown the YFH website images again and asked:

---

[10] Here, and on subsequent screens showing the YFH website, respondents could scroll through the YFH webpages, if so desired, but were not required to view all three pages again.
[11] The order in which the first two response option were shown was consistent with the order in which the response options were listed for the previous question.

Please explain in as much detail as possible what makes you think the services offered on this website are affiliated with, or sponsored or approved by, the company whose website you were shown in the <u>first section</u> of the survey.

Respondents could type in any answer.

This concluded the series of questions regarding the YFH website. Respondents were then shown one of the two remaining websites (Nature's Sunshine and Health Grades) and the question series was repeated in a format identical to how the YFH website was presented. Upon completing the question series for a second website, then the third and final website was shown and the questions were repeated a final time.

The following three webpage images were presented to respondents when questioned about the Nature's Sunshine website:



And:



And:



The following three webpage images were presented to respondents when questioned about the Health Grades website:



HEALTH GRADES, INC [US] https://www.healthgrades.com
REVIEW YOUR DOCTOR
PATIENTS
PHYSICIANS
HOSPITALS
healthgrades
Better health begins here.
Search
Near
Current Location
Let's get started. What type of specialist are you looking for?
Family Medicine
Pediatrics
Internal Medicine
Dentistry
Cardiology
Obstetrics & Gynecology
Orthopedic Surgery
Ophthalmology
Endocrinology
Allergy
Dermatology
Gastroenterology

And:

HEALTH GRADES INC [US] https://www.healthgrades.com
REVIEW YOUR DOCTOR
PATIENTS
PHYSICIANS
HOSPITALS
You've already read our helpful reviews. Help others by writing your own.
You can help millions of people find the right doctor and the right care that they need. Share your experience today!
"I am very active and with that has come my share of mishaps. Dr Mastey explains exactly what is wrong and how we are going to repair. I sincerely trust him, his medical knowledge and Read more..."
This review is for
Dr. Robert Mastey, MD
"When I found out I was pregnant with my first child, I was hoping to find an OB who I could trust to have my best interest in mind. My husband did his research and found Dr. Brown Read more..."
This review is for
Dr. Dudley Brown Jr, MD
"I absolutely love this office. Front desk is always friendly, Kezia is fantastic, and Dr. Antonelli couldn't be more caring. They can generally get you in for an appointment very quickly if need Read more..."
This review is for
Dr. Nadine Antonelli, MD
REVIEW YOUR DOCTOR
Explore Healthcare
We've made it easy to find the best local providers in these popular specialties.

And:



The survey concluded for respondents once the question series had been asked once for each of the three websites.

The Nature's Sunshine and Health Grades websites were appropriate third-party websites to include in the lineup because they both use the generic term "Health" in connection with health-related services, but do not use any mark similar to the Healthprint mark.

<u>Control Group</u>

As mentioned above, the survey included a separate Control Group comprised of 200 unique respondents. The Control Group function is to measure the survey "noise" level or "false positive" level – i.e., the tendency of survey respondents to connect the two parties for reasons that do not suggest actual marketplace confusion, such as guessing, speculating that services are related merely because both relate to health evaluation, or other forms of respondent or survey error. The Control Group alters the allegedly

infringing mark in order to measure the extent to which respondents will nevertheless connect the parties even when shown materials for the alleged infringer that do <u>not</u> use a similar mark. This allows me to appropriately discount the Test Group rate by deducting this "noise" or "false positive" or placebo rate and arriving at a "net" confusion level that can be reliably attributed to the Shaklee use of Healthprint.

The Control Group took a survey identical to that of respondents in the Test Group with the sole exception that on the Shaklee website initially presented in the first section of the survey, the allegedly infringing HEALTHPRINT and finger print image wer removed and replaced with a Control mark – HEALTH STAMP – as illustrated in the following partial screenshot taken from one of the images presented to each Group:

Test Group:

Control Group:




This Control precisely conformed with the standard for creating an ideal control, as articulated in the Reference Guide on Survey Research: "In designing a control group study, the expert should select a stimulus for the control group that shares as many characteristics with the test group as possible, with the key exception of the characteristic whose influence is being assessed."[12] The Control held constant every

---

[12] 7 Shari S. Diamond, Reference Guide on Survey Research, Reference Manual on Scientific Evidence (Second edition, 2000), 229, at 258.

aspect of the Shaklee website and images that were shown to the Test Group, with the sole exception of removing the finger print image and the HEALTHPRINT mark:



And replacing it with the control mark:



The control images were ideal because each held constant all aspects of the Shaklee webpages shown to the Test Group with the sole exceptions of: 1) removing the finger print image, and 2) altering HEALTHPRINT to instead read HEALTHSTAMP.  No other aspects of the Shaklee webpages were altered.

The following control webpages containing the control mark were shown to the Control Group during the first section of the survey in lieu of the corresponding Test images. First, the Control Group was introduced to the Shaklee site:







Everything we do has been designed In Harmony with Nature™.

### SAFE

Our product ingredients are carefully selected to meet our high performance and screening standards, often surpassing the standards of the USP, a scientific, nonprofit organization that sets federally recognized public standards of quality for medicines, dietary supplements, and foods.

### PROVEN

Our products are backed by 71 patents and patents-pending and over 120 published scientific papers and presentations that show our products make a difference in your health.

### GUARANTEED

We believe in the safety and performance of all our products. That's why we stand behind every single one with a 100% guarantee or your money back. No questions asked. That's The Shaklee Difference.

ˈAll trademarks of the publications above are the property of their respective owners and are used only to identify media outlets featuring Healthsmart™



Then, the Control Group saw the following 12 webpages:

















Shaklee Corporation [US] | https://www.shaklee.com/us/en/healthstamp

Shaklee
Creating Healthier Lives

SHOP PERSONALIZED HEALTH BECOME A DISTRIBUTOR Product Search

HEALTHSTAMP Your Personalized Health Builder

What do you typically eat for **breakfast**?

- I rarely eat breakfast
- I tend to eat things like toast, bagels, muffins, cereal and oatmeal
- I eat a classic American breakfast (bacon, eggs, hash browns, etc.)
- I opt for lighter options like yogurt and fruit
- I get a mix of protein, fruit, and/or veggies from shakes and smoothies, or look for other sources of lean protein like eggs or egg-whites

Do you purchase **organic foods**?

- Always, whenever available
- I do, for certain types of food
- I'd like to, but it's too expensive
- No, I don't think it's worth it

Shaklee Corporation [US] | https://www.shaklee.com/us/en/healthstamp

Shaklee
Creating Healthier Lives

SHOP PERSONALIZED HEALTH BECOME A DISTRIBUTOR Product Search

HEALTHSTAMP Your Personalized Health Builder

How is your memory and concentration?

- Great, I'm sharp as a tack
- No problems now, but I worry about it getting worse
- OK, but I occasionally lose my train of thought
- It seems to be progressively deteriorating

How often do you exercise each week?

- Less than 1 hour
- 1-2 hours
- 2-4 hours
- More than 4 hours

How would you describe your weekly exercise?

- Light (walking, some stretching, etc.)
- Mostly cardio (jogging, elliptical machine, etc.)
- Moderate balance of cardio and weight training
- Intense (interval training, weight lifting, training for marathons, etc.)

Shaklee Corporation [US] | https://www.shaklee.com/us/en/healthstamp

Shaklee
Creating Healthier Lives

SHOP PERSONALIZED HEALTH BECOME A DISTRIBUTOR Product Search

HEALTHSTAMP Your Personalized Health Builder

What is your age?

Your Age (Years)

What is your weight and height?

Weight (in lbs)

Height (ft) Height (in)

Shaklee Corporation [US] | https://www.shaklee.com/us/en/healthstamp

**Shaklee**

SHOP   PERSONALIZED HEALTH   BECOME A DISTRIBUTOR   Product Search

HEALTHSTAMP  Your Personalized Health Builder

Do you have any **dietary restrictions**?

| ☐ Gluten Free | ☐ Soy Free |
| ☐ Nut Free | ☐ Dairy Free |
| ☐ Vegetarian | ☐ Kosher |
| ☐ None | |





And finally:

Shaklee
HEALTHSTAMP
Your Healthstamp diet score of 54 shows you're heading in the right direction.
Your Healthstamp lifestyle score of 71 shows you want to keep moving.
It looks like you've already started making choices that can lead to positive changes in your health. Based on your responses, here are some things you can do to take the next step in improving your diet:
Omega-3 fatty acids are an important part of a healthy diet. You can meet this need by eating fish or by consuming high-quality omega-3 supplements.
A great way to improve your diet is to eat to 2-3 servings of fruit every day.
Eat your veggies! Begin to improve your diet by eating at least three servings of vegetables every day.
You're doing a lot of things right by making exercise, sleep, and stress reduction a priority. Here are a few things you can do to build on your healthy lifestyle choices based on your health assessment.
For busy people especially, it's important to make time for self-care because stress can have long-term health impacts.
Regular physical activity of at least 2-3 hours a week is recommended, unless medical conditions preclude it.
If you occasionally need help with sleep, some simple tweaks to your bedtime habits and diet can help.
23.7
Body Mass Index (BMI) is a universally recognized measure of body composition based on height and weight. Based on the answers you provided, your BMI is 23.7. According to the World Health Organization, you are in the normal range for BMI. Keeping your weight under 183 pounds will keep you at a healthy weight.
Let's Take A Closer Look At Your Top Health Goals
Goal 1: Healthy Heart
Goal 2: Weight Loss
Goal 3: Immune Support
You are not alone in having a concern about your weight, and there are right and wrong ways to address it. We don't believe in miracle cures. Take that first step and remember ... continue
Your immune system is an incredibly complex network that must function 24/7 to protect your health. Your diet may be lacking in nutrients critical to optimal immune function ...
Next, See How the Shaklee Difference Can Help Achieve Your Goals
Everything we do has been designed in Harmony with Nature™. Safe. Proven. Guaranteed.
Guaranteed - We stand behind our products with a 100% money-back guarantee—no questions asked.
Now, Choose From 3 Personalized Recommendations
LIMITED TIME OFFER
ON ADVANCED AND COMPREHENSIVE RECOMMENDATIONS
HEALTHSTAMP





Because the sole difference between the Test and Control Groups was the replacement of the allegedly infringing mark with the control mark Healthstamp on the Shaklee webpage images, the difference between the Test Group result and the Control Group

result reflects the level of likely confusion attributable to the use of the allegedly infringing HEALTHPRINT mark.

This concluded the survey for all respondents in the Control Group.

Screenshots of the survey will be provided in Appendix C.

## SUMMARY OF KEY FINDINGS

This section details certain key survey findings.  Other survey results are discussed further in the Detailed Findings section below.

The net level of confusion between the Test and Control Groups is 7.0%:

| Final Net Confusion Rate between Shaklee and YFH Services | |
|---|---|
| Test Group Total Confusion Rate (Healthprint) | 27.5% |
| Control Group Total Noise Rate (Healthstamp) | 20.5% |
| Final Net Rate of Confusion | 7.0% |

A net confusion result of 7.0% is low and supports a finding that there is not a likelihood of confusion between Shaklee and YFH due to the HEALTHPRINT mark at issue.

This finding is also confirmed by the fact that only 6.5% of respondents in the Test Group connected the Shaklee and YFH services _and_ mentioned the term Healthprint as one of their reasons for doing so.

It is also significant that the rate at which Test Group respondents connected YFH Healthprint to Shaklee Healthprint (27.5%) does not exceed the rates at which they connected the unrelated third-party sites (Nature's Sunshine and Health Grades) to Shaklee (33.5% and 25.0%):

| Test Group Results – Summary Table | YFH | Nature's Sunshine | Health Grades |
|---|---|---|---|
| **Base** | N=200 | N=200 | N=200 |
| **RESPONSE OPTION** | **Percentage and number providing each response** | | |
| The same company as the website you were shown in the first section of the survey | 15.0% 30 | 23.0% 46 | 15.0% 30 |
| Are affiliated with, or sponsored or approved by, the company whose website you were shown in the first section of the survey | 12.5% 25 | 10.5% 21 | 10.0% 20 |
| Total confusion/noise | 27.5% 55 | 33.5% 57 | 25.0% 50 |

Based on the survey results, it is my opinion that Shaklee's use of Healthprint in connection with its services does not create a likelihood of confusion with respect to YFH's Healthprint mark and services.

See Detailed Findings section below for additional information on results. The full data will be provided in its original electronic form in Appendix D.

# METHODOLOGY

## THE RELEVANT UNIVERSE OF INTEREST

The appropriate sample universe for this survey consisted of U.S. consumers age 21 and older who would consider using blood-testing services to analyze nutritional needs.  As indicated above, this is the appropriate definition of the relevant universe for studying likelihood of reverse confusion, as this definition encompasses the senior user's (YFH's) prospective consumers.  As detailed below, the survey also contained a significant sub-sample of individuals who are also prospective consumers of Shaklee's services and, therefore, fall within the relevant universe for forward confusion.

The following screening questions were employed to ensure the final survey sample was comprised of respondents from the appropriate sample universe.

After initial demographic questions, all potential respondents were asked:

> Which of the following type of health-related services or products, if any, would you consider using in the next 2 years?
>
> *(Select all that apply)*

The following table displays the randomized list of response options available from which respondents could select and the proportion of final respondents who selected each:

| Health-Related Services or Products Would Consider | | |
|---|---|---|
| N=400 | # | % |
| Blood-testing to analyze your nutritional needs | 400 | 100.0% |
| Purchase of nutritional supplements | 332 | 83.0% |
| Online reviews and information about physicians | 304 | 76.0% |
| Online questionnaire for providing you personalized health recommendations | 281 | 70.3% |
| Gastric band surgery for weight loss | 43 | 10.8% |
| Laser removal of tattoos | 37 | 9.3% |
| None of these | 0 | 0.0% |

Respondents who selected "blood-testing to analyze your nutritional needs" were considered part of the relevant sample universe and qualified to participate in the main survey because they are prospective consumers of the YFH Healthprint service shown in the survey. Respondents who selected the "online questionnaire" option would also be appropriately deemed prospective consumers of Shaklee's Healthprint service. The other options on the list were provided to mask the intention of the survey from respondents and to provide a variety of options from which they could select.

As is standard practice, respondents who work or have someone in their immediate household who works in advertising or market research were screened out.

This concluded the screening and classification questions for all respondents.

The actual wording of the screening questions used is shown in Appendix B.

## SAMPLING PLAN

The sampling plan involved a random selection of consumers who are part of an online panel.

Online surveys are well-accepted in the field of survey research as a standard, reliable methodology. Indeed, online surveys are now the most common method of conducting market research among consumers. Businesses and other organizations routinely make decisions of importance based on the results of online survey research, and online surveys have been accepted in evidence in numerous U.S. District Court cases. I have personally designed and executed numerous internet surveys that have been accepted by courts. An online survey was particularly appropriate in this case as both parties' services are heavily marketed and purchased through the parties' websites and the survey simulated encounter of the marks on websites.

The sample of panelists used in the survey was provided by Research Now, a leading supplier of online sample for surveys. I have worked with Research Now on many surveys and have found its procedures and panels to be highly reliable. Research Now has a large and diverse panel consisting of millions of Americans and is highly regarded as a reputable source of respondents for online surveys within the field of market research. Research Now utilizes appropriate industry procedures for ensuring the integrity and quality of its panels. Research Now employs a "by-invitation-only" panel recruitment model to enroll pre-validated individuals and, therefore, maintains a panel comprised of the most credible survey takers who are less prone to self-selection bias. Quality and integrity of Research Now's research panel is also obtained and maintained in the following ways.

- It requires a double opt-in and agreement to provide truthful and well-considered answers to online market research surveys. First, potential panelists opt-in during the enrollment process, and then they are sent a follow-up email confirmation that requests the potential panelist to click a link to validate the opt-in. Then, he or she is sent a follow-up email providing access to their member account and they can begin receiving surveys.

- A unique email address is required to opt-in to the panel and physical addresses provided by panelists in the US are verified against government postal information.

- Research Now implements data quality measures by focusing on identifying and pursuing panelists who exhibit suspicious behaviors. This is done by identifying members through routine review of behaviors and sometimes with the help of its clients, and then evaluating a wider set of behaviors, particularly members profile information and survey performance.

- Research Now also employs a "Three Strikes Policy" in which panelists who commit survey offenses, such as speeding, inattentiveness, poor quality responses to open-ended questions, answering inconsistencies, and selecting dummy answers, are flagged with an "offense" code. Panelists who are flagged three times for such offenses are disqualified from panel membership and future surveys.

Throughout the initial field period, I monitored the actual rate of qualification within each individual age and gender group.  The calculated incidence of relevant consumers within each age and gender group is shown in the following table:

| Calculated Incidence Within Each Age & Gender Group: | | |
|---|---|---|
| | Male | Female |
| 21 – 34 | 48.6% | 47.1% |
| 35 – 54 | 36.9% | 37.4% |
| 55 and older | 31.3% | 35.8% |

I then calibrated these calculated incidence rates against U.S. Census data by age and gender and set revised age and gender quotas for the final sample.

The following table displays the final proportion of sample achieved by age and gender in each Survey Group:

| Final Number of Respondents in Each Group | | |
|---|---|---|
| N=200 per Group | N | % |
| Male 21 – 34 | 33 | 16.5% |
| Male 35 – 54 | 37 | 18.5% |
| Male 55 and older | 25 | 12.5% |
| Female 21 – 34 | 32 | 16.0% |
| Female 35 – 54 | 38 | 19.0% |
| Female 55 and older | 35 | 17.5% |

This methodology for producing a representative sample of the relevant category (here, potential consumers of blood-testing to analyze nutritional needs) is standard and well-accepted.

Invitations were also sent in proportion to U.S. Census data by region. The following table displays the final proportion of sample achieved by region:

| Final Number of Respondents by Region (N=400) | |
|---|---|
| Midwest | 20.5% |
| Northeast | 19.0% |
| South | 17.3% |
| West | 21.5% |
| Southeast | 21.8% |

## DATA PROCESSING

Data was collected by Focus Vision, a company specializing in web survey programming and data collection and processing, and made available to Hal Poret, LLC through an electronic portal on an ongoing basis.  The data set showing each respondent's answers to all questions will be provided in electronic form.[13]

## INTERVIEWING PROCEDURES

The online survey was programmed and hosted by Focus Vision.  My staff and I thoroughly tested the programmed survey prior to any potential respondents receiving the invitation to participate in the survey.

## DOUBLE-BLIND INTERVIEWING

It is important to point out that the study was administered under "double-blind" conditions.  That is, not only were the respondents kept uninformed as to the purpose and sponsorship of the study, but the services involved in providing the sample and administering the online interviews (Focus Vision and Research Now) were similarly "blind" with respect to the study's purpose and sponsorship.

## INTERVIEWING PERIOD

Interviewing was conducted from July 5, 2017 through July 21, 2017.

## QUALITY CONTROL

Several measures were implemented to ensure a high level of quality control and validation with respect to respondents taking the survey.

Upon initially entering the survey, all respondents were required to pass a test to verify that each respondent was a live person. The test employed in this survey is a

---

[13] See Appendix D of this report.

CAPTCHA[14] program that generates a task that humans can pass but current computer programs cannot. CAPTCHA is a well-known and widely-used tool in online survey research.

Upon successfully passing the CAPTCHA test, respondents were then asked to enter their year of birth and then their gender.  This information was checked against the sample provider's (Research Now's) demographics on record for each respondent and any respondent providing an incorrect or inconsistent birth year and/or gender was unable to continue to the main survey.

Additionally, respondents were then asked to select their age range. Respondents who selected an age range inconsistent with their year of birth were unable to continue with the survey.

These combined steps ensured that the survey was being taken by an actual live person and that each person was paying a certain level of attention to the survey questions and taking a certain level of care in entering responses.

All respondents were also asked to select any web browsers or search engines they have used in the past three months. Respondents could select as many as applied to them from a list of ten options, including, "other," "not sure" and one fictitious name: Hagelin. Respondents who selected "Hagelin" were unable to continue.  Additionally, respondents who answered that they have used all seven of the actual web browsers and search engines included on the response list, were identified as "yea-sayers" and unable to continue with the survey.[15]

---

[14] CAPTCHA is an acronym for "Completely Automated Public Turing test to tell computers and Humans Apart."
[15] "Yea-sayers" in surveys are typically defined as respondents who answer affirmatively to questions, regardless of their belief.

The following question was also asked and permitted additional screening out of respondents who were paying insufficient attention or clicking responses indiscriminately:

> For quality assurance, please type the word "blue" in the blank next to the "Other" box below and then click to continue.
> - Strongly agree
> - Agree
> - Neutral
> - Disagree
> - Strongly disagree
> - Other _____

Respondents who selected "other" and typed a response in the blank continued with the survey. A review was conducted of all open-ended answers, including responses to this question and respondents who failed to follow instructions for this question, or gave other non-responsive or nonsense answers to open-ended questions were removed from the final data.

Respondents were then also asked to carefully read these instructions:

- Please take the survey in <u>one</u> session without interruption.
- Please keep your browser window maximized for the entire survey
- Please answer all questions on your own
- Please do not consult any website or other materials while taking the survey
- If you normally wear eye glasses or contact lenses when viewing a computer screen, please wear them for the survey.

Two options were provided in response to these instructions: 1) I understand and agree to the above instructions, and 2) I do not understand or do not agree to the above

instructions.  Only respondents who understood and agreed to the instructions then continued to the main section of the survey.

Additionally, the survey program was set up in such a way as to restrict respondents from taking the survey via mobile devices.  This contributed to ensuring respondents could easily and clearly view the images displayed in the surveys as well as each question and corresponding response options.

## *DETAILED FINDINGS*

**I)    Likelihood of Confusion between Shaklee Healthprint and YFH Healthprint**

*Source Confusion – Services come from the same company*

In the Test Group 15.0% (30 out of 200) answered that the services on the YFH website are from the same company as the website they saw in the first section of the survey – i.e. Shaklee.  In the corresponding Control Group in which the Shaklee Healthprint mark (and finger print image) had been replaced with the control term Healthstamp, 8.0% of respondents (16 out of 200) answered that services on the YFH website are from the same company as the website they saw in the first section of the survey (Shaklee):

| YFH Website -- Q360: Do you think that the services offered on this website are from... | Test Group | Control Group |
|---|---|---|
| **Base** | N=200 | N=200 |
| The same company as the website you were shown in the first section of the survey | 15.0% 30 | 8.0% 16 |
| A different company than the website you were shown in the first section of the survey | 75.5% 151 | 82.0% 164 |
| No opinion/don't know | 9.5% 19 | 10.0% 20 |

This results in a **7%** net rate of source confusion, as illustrated by the following table:

| Net Rate of Source Confusion between Shaklee and YFH Websites | |
|---|---|
| Test Group Initial Confusion Rate | 15.0% |
| Control Group Initial Noise Rate | 8.0% |
| Initial Net Rate of Confusion | 7.0% |

*Additional Confusion – Affiliation, Sponsorship or Approval*

In the Test Group, an additional 25 respondents answered that they thought the services on the YFH website are affiliated with, or sponsored or approved by, the company whose website they saw in the first section of the survey. In the Control Group, an additional 25 respondents answered the same:

| YFH Website -- Q370: Do you think the **services** offered on this website... | Test Group | Control Group |
|---|---|---|
| **Base** | N=200 | N=200 |
| Are affiliated with, or sponsored or approved by, the company whose website you were shown in the first section of the survey | 12.5% 25 | 12.5% 25 |
| Are not affiliated with, or sponsored or approved by, the company whose website you were shown in the first section of the survey | 56.0% 112 | 62.5% 125 |
| No opinion/don't know | 16.5% 33 | 17.0% 34 |

Combining these respondents in each Group with those who initially answered that the services on the YFH website are from the same company as the services on the Shaklee website, brings the total rate of confusion in the Test Group to 27.5% (55 out of 200) and the total rate of noise in the Control Group to 20.5% (41 out of 200).

This results in a final net confusion rate of 7.0% as illustrated by the following table:

| Final Net Confusion Rate between Shaklee and YFH Websites | |
|---|---|
| Test Group Total Confusion Rate | 27.5% |
| Control Group Total Noise Rate | 20.5% |
| Final Net Rate of Confusion | 7.0% |

A net confusion result of 7.0% for this type of survey is low and supports a finding that there is not a likelihood of confusion between Shaklee's Healthprint service and YFH due to the HEALTHPRINT mark at issue.

### Rate of Mentioning HEALTHPRINT As Reason for Connecting YFH and Shaklee

Although the comparison of the Test and Control Group rates of connecting the YFH Healthprint service to Shaklee discussed above is the main method, and the more scientific and objective method, for assessing the extent to which any confusion attributable to the Healthprint mark exists, it is also worth considering the open-ended answers of respondents explaining <u>why</u> they answered that the YFH and Shaklee services shown are from the same company or otherwise connected.

Of the 55 Test Group respondents who answered that the services on the YFH website are either from the same company or affiliated with, or sponsored or approved by the same company as the Shaklee website, 13 (6.5% of all 200) identified the HEALTHPRINT mark as their reason. The verbatim reasons provided by these respondents are displayed in the following tables:

| Test Group – Same Company: Q365: Please explain in as much detail as possible what makes you think that the services offered on this website are from the same company as the website you were shown in the first section of the survey? | |
|---|---|
| Resp. ID | Verbatim Answers that Mention HEALTHPRINT |
| 110 | It says to click to register for Health Print so I think they are at least associated |

| 253 | because of 'healthprint' |
| 264 | They both have the name HealthPrint to get testing done and offer the exact same services for each company.So due to the fact that they both are HealthPrint related is why i think they are the same compay as each other. |
| 316 | the name on the pages |
| 396 | The first section, I believe was Health Print, or at the least the same type of service. |
| 596 | The company in the header is same in both and they are both referring to blood testing. |
| 672 | The healthprint seemed exactly the same |
| 857 | Similar blood testing giving same results. Brand names are the same. |
| 1056 | It appears that views #2 and #3 are from the same site as the contents refers to the same company, etc. |
| 1062 | I thought the first company referred to Healthprint and I saw that in this website. |

| Test Group – Affiliated with, Sponsored or Approved by: Q375: Please explain in as much detail as possible what makes you think the services offered on this website are affiliated with, or sponsored or approved by, the company whose website you were shown in the first section of the survey. | |
| --- | --- |
| Resp. ID | Verbatim Answers that Mention HEALTHPRINT |
| 429 | Both refer to  Healthprint |
| 773 | The Health print looked familiar. |
| 1013 | The logo from the first website appeared on this one. |

The 6.5% rate at which respondents identified the HEALTHPRINT mark as their reason for connecting the two sites further validates the net 7.0% confusion result and further supports the conclusion that there is not a likelihood of confusion.

## II)      Results Regarding Third-Party Sites

Again, while the key method of analysis is comparing the Test and Control Group rates of connecting the YFH Healthprint service to Shaklee, it is also worth considering the rates at which respondents connected the other third-party health-related services to Shaklee, as this also provides insight into the baseline level of survey noise – i.e., the

tendency to connect two health-related services even in the absence of any similar trademark usage.

Of the 200 Test Group respondents, 23.0% (46) answered that the services on the Nature's Sunshine third-party website are from the same company as the Shaklee website. Meanwhile, 15.0% of respondents (30 out of 200) answered that services on the Health Grades third-party website are from the same company as the website they saw in the first section of the survey:

| Third-Party Website -- Q360: Do you think that the services offered on this website are from... | Nature's Sunshine | Health Grades |
|---|---|---|
| **Base** | N=200 | N=200 |
| The same company as the website you were shown in the first section of the survey | 23.0% 46 | 15.0% 30 |
| A different company than the website you were shown in the first section of the survey | 68.0% 136 | 76.0% 152 |
| No opinion/don't know | 9.0% 18 | 9.0% 18 |

This results in 23.0% and 15.0% initial rates of noise between the unrelated third-party websites and Shaklee.

An additional 21 Test Group respondents answered that they thought the services on the Nature's Sunshine website are affiliated with, or sponsored or approved by, the company whose website they saw in the first section of the survey and an additional 20 respondents answered the same for the Health Grades site:

| Third-Party Website -- Q370: Do you think the services offered on this website... | Nature's Sunshine | Health Grades |
|---|---|---|
| **Base** | N=200 | N=200 |
| Are affiliated with, or sponsored or approved by, the company whose website you were shown in the first section of the survey | 10.5% 21 | 10.0% 20 |
| Are not affiliated with, or sponsored or approved by, the company whose website you were shown in the first section of the survey | 50.5% 101 | 57.0% 114 |
| No opinion/don't know | 16.0% 32 | 178.0% 36 |

Combining these respondents with those who answered that the services on each third-party website are from the same company as the Shaklee website, brings the total noise rates between the third-party sites and Shaklee to 33.5% (67 out of 200) and 25.0% (50 out of 200).

The following table displays the total confusion rate of Test Group respondents who connected YFH Healthprint to Shaklee Healthprint compared to the rates that each of the unrelated third-party websites was connected to Shaklee Healthprint:

| Test Group Results – Summary Table | YFH | Nature's Sunshine | Health Grades |
|---|---|---|---|
| **Base** | N=200 | N=200 | N=200 |
| The same company as the website you were shown in the first section of the survey | 15.0% 30 | 23.0% 46 | 15.0% 30 |
| Are affiliated with, or sponsored or approved by, the company whose website you were shown in the first section of the survey | 12.5% 25 | 10.5% 21 | 10.0% 20 |
| Total confusion/noise | 27.5% 55 | 33.5% 57 | 25.0% 50 |

The 33.5% and 25.0% rates at which the Test Group connected the unrelated third-party

sites to Shaklee Healthprint confirms that the rate of connecting YFH Healthprint to Shaklee Healthprint (27.5%) is within the range of typical survey noise and does not indicate a likelihood of confusion – i.e., the rate of connecting the YFH Healthprint service to Shaklee Healthprint does not exceed the baseline tendency to answer that a health-related service is connected to Shaklee even in the absence of any similar trademark usage.

## CONCLUSION ON PORET SURVEY

Based on the results, it is my opinion that Shaklee's use of the Healthprint mark does not create a likelihood of confusion with respect to YFH's Healthprint mark or services.

# *MARTENSEN SURVEY ANALYSIS*

## BRIEF OVERVIEW OF MARTENSEN SURVEY

This section briefly describes the key elements of the Martensen Survey. Other detail is provided in the Martensen Report and in the Analysis section below.

The general definition of the survey universe consisted of individuals who "purchase any health care products or services for yourself."

A sub-group within the general universe, defined by Mr. Martensen as the Sophisticated Consumers Group also met the following criteria:

- Have "purchased or used" a "health screening test"

- Are at least somewhat likely to use a "blood test" [16]
- Have income of $75,000 or more

During the screening section of the survey, Mr. Martensen asked respondents which of a list of companies they have heard of, listing "Healthprint" as a company, along with Shaklee and Your Future Health as separate companies.

* 6. Which of the companies listed below are you aware of, if any? Select one answer for each

| | Yes | No / Not Sure |
|---|---|---|
| CVS Pharmacy | ○ | ○ |
| GNC | ○ | ○ |
| Healthprint | ○ | ○ |
| Johnson & Johnson | ○ | ○ |
| Shaklee | ○ | ○ |
| Time Health | ○ | ○ |
| Vitamin Shoppe | ○ | ○ |
| Walgreens | ○ | ○ |
| Your Future Health | ○ | ○ |

Respondents were also asked the following, again listing "Healthprint" as a company:

---

[16] Mr. Martensen incorrectly states in his report (page 5) that those in the Sophisticated Consumers Group purchased a health screening test, whereas the screening question actually asked if they have ever purchased "or used" a health screening test. Mr. Martensen also incorrectly states that those in the Sophisticated Consumers Group said they were likely to purchase a blood test, whereas the screening question actually asked if they would "use" a blood test.

* 7. Have you ever purchased or used products or services from any of the companies below? Select only those that you remember using

☐ CVS Pharmacy

☐ GNC

☐ Healthprint

☐ None of the above

Respondents were then asked another question about the company "Healthprint":

* 8. How did you learn about **Healthprint**? Select one answer that applies best

○ Internet search

○ Distributor or re-seller of vitamins/supplements

○ Family, friend or associate (but not a distributor or re-seller)

○ Physician or health care provider

○ Don't Know / Don't Remember

Respondents were next asked questions about Shaklee and questions about Your Future Health.

Ultimately, respondents were asked a number of questions which Mr. Martensen considers the basis for his confusion analysis, starting with a question about "the **'Healthprint'** name:

* 14. In connection with the **'Healthprint'** name, do you think...? Select one answer that applies best

○ It is from a single company

○ It is from more than one company

○ Does not refer to any company

○ Not Sure / Don't Know

Respondents were also asked a number of question about "The **Healthprint** service"

including:

*Please read the following description and answer the question that follow.*

The **Healthprint service** provides early detection of **disease** for individuals **by** reviewing answers to health questions and performing laboratory tests, with or without a blood test. The result is a more customized **recommendation for supplements and lifestyle changes to** achieve optimal health.

\* 17. Do you think the **Healthprint service** described above...? Select one answer

- ○ Is from a single company
- ○ Is from more than one company
- ○ Does not refer to any company
- ○ Not Sure / Don't Know

\* 20. When considering the **Healthprint service** with a blood test sold at a higher price than the Healthprint service without a blood test, do you think...? Select one answer only

- ○ The services are from a single company
- ○ The services are from more than one company
- ○ Does not refer to any company
- ○ Not Sure / Don't Know

Respondents who answered "single company" or "more than one company" in these questions were asked follow-up questions as to why they gave these answers. However, the follow-ups to Question 20 (Questions 21 and 22) asked why the respondent answered that the service comes from the "same company" or from a "different company" when these were not the answers respondents had given. Rather, the answer choices respondents had selected were either that "the Healthprint service" comes from a "single company" or "more than one company."

Respondents were also asked the following two questions.

* 23. Do you think the **Healthprint services** that are sold with and without a **blood test** have similar or different...? Select one answer for each

| | Not Sure | 1- Very Different | 2 | 3 | 4 | 5 | 6 | 7 - Very Similar |
|---|---|---|---|---|---|---|---|---|
| Distributors or re-sellers | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Marketing and promotion | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Consumers or end-users | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |

* 24. If you were considering using the **Healthprint services** in the future, how unimportant or important are the factors below in making a decision to purchase? Select one answer for each

| | Very Unimportant | Somewhat Unimportant | Neither Unimportant or Important | Somewhat Important | Very Important |
|---|---|---|---|---|---|
| Price that provides a good value | ○ | ○ | ○ | ○ | ○ |
| Recommendation from family, friend | ○ | ○ | ○ | ○ | ○ |
| Advertisement or promotion | ○ | ○ | ○ | ○ | ○ |
| Endorsement from a company you trust | ○ | ○ | ○ | ○ | ○ |
| Sold by a distributor or re-seller you trust | ○ | ○ | ○ | ○ | ○ |

Mr. Martensen ultimately presents the following table of results:

**TABLE A**

| | All Consumers | Sophisticated Consumers |
|---|---|---|
| Q #14 Healthprint name is from single company | 24.7% | 27.0% |
| Q #17 Healthprint service is from single company | 49.2% | 58.3% |
| Q #20 Healthprint service w/ blood test sold at a higher price is from a single company | 34.6% | 37.7% |
| Q #23 Healthprint service has similar | | |
| a. Distributors or re-sellers | 38.6% | 46.4% |
| b. Marketing or promotion | 41.5% | 46.8% |
| c. Consumers or end-users | 44.9% | 51.2% |

* Composite Score = {Q#14 + #17 + #20 + #23 a. b. c.) / 6}

Mr. Martensen then computes a "composite score" – the average of the 6 results shown above – which works out to be 39% for all consumers and 45% for Sophisticated Consumers.  Mr. Martensen then opines that there is a 15% likelihood of confusion standard and points out that his figures exceed 15% (although as explained below, Mr. Martensen's questions do not measure confusion at all and so there is no rational basis for comparing these figures to any likelihood of confusion standard).

## DETAILED ANALYSIS OF MARTENSEN SURVEY AND REPORT

The Martensen survey entirely fails to comply with at least four fundamental requirements for likelihood of confusion surveys.  Each such failure is a fatal flaw that, on its own, would render the survey unreliable.  The combination of these severe flaws makes the Martensen survey so severely deficient as to have no value and not even approach the minimum standards for reliability.  Each of these flaws is discussed below.

I.    **The Martensen Survey failed to show any mark as it would actually be encountered by prospective consumers under real marketplace conditions.**

It is among the most fundamentally accepted requirements for likelihood of confusion surveys that the survey replicate the marketplace conditions under which the relevant marks are encountered by prospective consumers.  As Professor McCarthy explains, a survey's methodology must mirror the situations in which consumers encounter the service or mark and should reflect marketplace conditions with respect to the

presentation of survey stimuli.[17]  Material distortions of marketplace presentation of the marks is a flaw that has been frequently identified as leading to survey exclusion.[18]

The Martensen Survey failed to comport with this basic requirement in the most egregious manner.  It showed the bare word "Healthprint" in the text of questions and failed to show either party's mark as it is used by the parties and as would be encountered by consumers under real marketplace conditions.  As Mr. Martensen notes (page 1), both parties use "website content" to promote, inform, and exchange information about their services.  The following shows how the Healthprint mark is actually presented in the context of such a real marketplace use by Shaklee:

https://m.shaklee.com/us/en/healthprint



Get Your Personalized Plan





---

[17] J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition (September 2007) at Section 32:163.*
[18] Swann, Jerre B. (2012), "Survey Critiques," in *Trademark and Deceptive Advertising Surveys: Law, Science, and Design,* edited by Shari Seidman Diamond and Jerre B. Swann, American Bar Association (pp. 374-5).

As the above image shows, a real consumer who encounters Shaklee's use of "Healthprint" would do so in a context where they see a great deal of additional content, including: (1) the Shaklee name in the website address; (2) the Shaklee name immediately adjacent to "Healthprint" in the body of the page; (3) the Shaklee name in a stylized green font as part of a logo; (4) information and imagery communicating the nature and purpose of the Healthprint service; and (5) colors, stylized fonts, designs, and other elements of trade dress that influence the overall commercial impression of the service. A visitor to the Shaklee Healthprint website would certainly have the opportunity to understand what the service is, see that Shaklee is the source of the service, and see the other information and context.

Likewise, consider the following image from the YFH website:



As with the Shaklee site, the Your Future Health name is visible in connection with the use of "Healthprint" in both the web address and the body of the page. The "YFH" and

a logo portion of the YFH symbol are also visible.  The page also provides information explaining what the YFH Healthprint service consists of.

In sum, in the actual marketplace, consumers would encounter the parties' uses of "Healthprint" under circumstances that also convey a wealth of other information that is relevant to perception of the source, such as company names and logos, web addresses, information about the nature of the services, and various style and design elements.  Of course these real world materials also allow a consumer to understand that one service is an online questionnaire and the other is a blood test.  All of these are critical factors that impact whether or not a consumer would be likely to confuse the parties' uses of Healthprint.

The Martensen Survey, however, simply showed respondents the bare term "Healthprint" in the text of questions such as the following:

* 14. In connection with the 'Healthprint" name, do you think...? Select one answer that applies best

    It is from a single company

    It is from more than one company

    Does not refer to any company

    Not Sure / Don't Know

* 17. Do you think the Healthprint service described above...? Select one answer

    Is from a single company

    Is from more than one company

    Does not refer to any company

    Not Sure / Don't Know

The mere insertion of the bare term "Healthprint" into the wording of a question entirely fails to simulate any realistic encounter with either party's use of its mark.

Respondents were shown no webpages, advertisements, or any other real world use of either mark. Rather, they were deprived of all real world context and information that a prospective consumer would have. For this reason, the Martensen Survey is nothing more than the most artificial and suggestive word game (and one that could not even address the issue of confusion because it does not even ask whether the parties' respective uses come from the same or affiliated sources). Such an exercise of presenting the term "Healthprint" in the abstract tells us nothing at all about the likelihood of real world consumers being confused upon encountering the marks under actual marketplace conditions. This flaw alone renders the survey results entirely unreliable.

The impropriety of showing a bare mark apart from real world marketplace conditions is well-settled. Indeed, Mr. Martensen's survey was rejected in a recent trademark confusion case for this exact reason. In another case involving two entities that both used the term "Reserve," Mr. Martensen conducted a survey in which respondents were asked the following:

- How different or similar do you think are the names Reserve versus Reserve Q?
- How likely do you think the names Reserve and Reserve Q are associated with products or services offered by the same company?"

The Court refused to consider Mr. Martensen's survey for testing for the wrong type of confusion, but also indicated that the survey would have otherwise been excluded under Daubert grounds because it "did not show respondents the marks as they appear in the marketplace."[19]

---

[19] Reserve Media, Inc. v. Efficient Frontiers, Inc. (CV 15-05072 DDP (AGrx) C.D.C.A. 4-14-17. In fact, Mr. Martensen's Survey in the present case is even more flawed than the one that would have been excluded in the *Reserve* matter, because at least there was a question in the *Reserve*

Another survey was recently excluded for the same reason.  In that case, HTC was accused of infringing Plaintiff's "VIVE" mark by using the term "VIVE" in connection with an HTC virtual reality headset.  Plaintiff's survey expert simply showed the term VIVE outside of any marketplace use (such as packaging, advertising, website, product, etc) and asked questions about the bare term "VIVE."  The court excluded the survey because, among other reasons, it "failed to replicate actual market conditions in which consumers might encounter the parties' marks."[20]

In sum, even if there were no other flaws, the Martensen Survey would be completely valueless due to its failure to test the marks as they appear in the marketplace, which means the survey has no bearing on whether there is a real world likelihood of confusion.

## II.   The Martensen Survey asks no questions addressing trademark confusion

Another flaw that single-handedly renders the Martensen Survey valueless is that it fails to ask a single question that addresses the issue of confusion.  Mr. Martensen states

---

survey purporting to ask whether the Plaintiff's and Defendants' marks come from the same company.  As discussed below, the Martensen Survey here did not contain a single question addressing whether consumers believe the Shaklee and YFH services come from the same source.

[20] VALADOR, INC., v. HTC CORPORATION, Case No. 1:16-cv-1162 (explaining that the survey did not show the marks as they appear in commerce, as it showed them without any other styling, words, symbols, or images that typically encounter the mark or as either party uses the term in the marketplace.)  This point was also made in *Componentone, L.L.C. v. Componentart, Inc.*, where the court rejected a confusion survey for testing the terms Component One and Component Art on their own, rather than in connection with a webpage, ads, or other real world materials in which consumers would typically encounter the terms: "The survey's stimuli did not replicate the parties' marks as they would be encountered in any of these situations in which a potential purchaser would encounter the parties' products or services…The survey, therefore, cannot serve as a meaningful measure of either source or initial interest confusion under the fourth or sixth prong of the Lapp calculus." Componentone, L.L.C. v. Componentart, Inc., 2008 U.S. Dist. LEXIS 87066 (W.D. Pa. 2008).

(page 4) that his survey design followed the Squirt format.[21] It certainly did not. In a Squirt Survey, respondents are shown <u>both</u> parties' uses of its mark, and are asked whether they think the two uses come from the same company or are otherwise connected.[22] For instance, my survey: (1) showed Shaklee's use of its Healthprint mark in connection with Shaklee's service; (2) subsequently showed YFH's use of its Healthprint mark in connection with YFH's service; and (3) asked whether the two services come from the same company or are otherwise affiliated/approved. These questions directly assess confusion – i.e., whether or not consumers perceive the two services to come from the same source or sources that have an affiliation/approval relationship. The Martensen Survey did <u>not</u> present both parties' marks and did not ask about a potential connection between the two services. There is not a single question for which the respondent's answer indicates a belief that the specific Shaklee and YFH services at issue come from the same or affiliated sources.

In fact, the Martensen Survey contains no elements that could possibly test for confusion. The entire survey consists of irrelevant, suggestive questions. Even before the main survey began, the survey was already irredeemably ruined by the initial series of questions. As shown earlier, respondents were asked:

---

[21] As noted above, my survey used the Squirt format. Mr. Martensen agrees that a Squirt survey is "well suited for testing likelihood of confusion in this case."

[22] For discussion of the Squirt format generally, see: Jerre Swann, Eveready and Squirt – Cognitively Updated, 106 TMR 727 at 743 (2016).

**\* 6. Which of the companies listed below are you aware of, if any? Select one answer for each**

| | Yes | No / Not Sure |
|---|---|---|
| CVS Pharmacy | ○ | ○ |
| GNC | ○ | ○ |
| Healthprint | ○ | ○ |
| Johnson & Johnson | ○ | ○ |
| Shaklee | ○ | ○ |
| Time Health | ○ | ○ |
| Vitamin Shoppe | ○ | ○ |
| Walgreens | ○ | ○ |
| Your Future Health | ○ | ○ |

This question specifically identifies "Healthprint" as a company, and a <u>different one</u> from Shaklee and Your Future Health.

Respondents were then asked the following question:

**\* 7. Have you ever purchased or used products or services from any of the companies below? Select only those that you remember using**

☐ CVS Pharmacy

☐ GNC

☐ Healthprint

☐ None of the above

Once again, this question identified "Healthprint" as a specific company.

The following question also asked how consumers learned about "Healthprint."

By this point, the survey had already told respondents very clearly that "Healthprint" is the name of <u>one specific company</u> by repeatedly listing "Healthprint" as a company.

This irredeemably biased respondents to believe that "Healthprint" is the name of a specific company (and a different company from Shaklee or YFH).

The first question that Mr. Martensen relies on then asked:

* 14. In connection with the 'Healthprint" name, do you think...? Select one answer that applies best

　　It is from a single company

　　It is from more than one company

　　Does not refer to any company

　　Not Sure / Don't Know

This question has no bearing on the issue of potential confusion between the Shaklee and YFH marks.  It was simply asking in the abstract whether the name "Healthprint" is from a single company, when the survey had just moments earlier shown multiple survey questions identifying "Healthprint" as the name of a company.  The question is simply bizarre and confusing, and it is not surprising that 56% of respondents answered "not sure/don't know."  The only thing surprising about the question is that only 24.7% answered "single company" given that the survey had previously told respondents that there is a company named Healthprint.  Presumably this 24.7% result reflects exactly that – that the survey had already identified "Healthprint" as a company name. Certainly there is nothing about this question that in any way tests whether respondents perceive Shaklee's Healthprint service and YFH's Healthprint service to come from the same company.[23]

---

[23] My assumption is that Mr. Martensen has confused the types of questions often asked in a secondary meaning survey with questions used to test for confusion.  The answer choices Mr. Martensen provided (single company versus more than one company) are characteristic of secondary meaning surveys.  Palladino, Vincent (2012) "Secondary Meaning Surveys," in Trademark and Deceptive Advertising Surveys: Law, Science, and Design," edited by Shari Seidman Diamond and Jerre B. Swann, American Bar Association.  On the other hand, a Squirt confusion survey asks whether the parties' marks come from the "same" or "different" companies.  The fact that the follow-up questions 21 and 22 refer to respondents having

The next Martensen question was as follows:

*Please read the following description and answer the question that follow.*

**The Healthprint service** provides early detection of **disease** for individuals **by** reviewing answers to health questions and performing laboratory tests, with or without a blood test. The result is a more customized **recommendation for** supplements and lifestyle changes to achieve optimal health.

\* 17. Do you think the **Healthprint service** described above...? Select one answer

○ Is from a single company

○ Is from more than one company

○ Does not refer to any company

○ Not Sure / Don't Know

This question also fails to address confusion for numerous reasons. First of all, the instruction instantly portrays the term "Healthprint" as the brand name for a specific service. The phrase "<u>The</u> Healthprint service" clearly suggests that "Healthprint" identifies a particular source, as the word "the" implies it is a specific branded service. When respondents are thereafter asked if "the" Healthprint service is from a single company, they have already been strongly biased to think so, because they have already been told both that "Healthprint" is the name of a specific company and that there is a specific service branded as "The Healthprint service."

Even regardless of those issues, the question also simply fails to test for confusion. The instruction describes "the Healthprint service" as a service that involves reviewing answers to questions <u>and</u> performing laboratory tests. This is clearly <u>not</u> the Shaklee

answered "same company" or "different companies" when the preceding questions had actually given the choices "single company" and "more than one company" reveals that Mr. Martensen is confusing these issues and likely making errors in attempting to convert a template from one type of survey for the other.

service, which is an online questionnaire and does not involve laboratory tests. Accordingly, the answer that the "Healthprint service" is from a "single company" has nothing to do with Shaklee's service in any way. The answers to the question cannot be assigned any meaning at all, because it is impossible to even know what it means that "the Healthprint service" is from a single company. This may, however, just mean that respondents (aided by the survey instructions) believe that there is a company called Healthprint that offers "the Healthprint service." There is nothing about the question that implies a belief that Shaklee's service has any connection to YFH's service.

The third question is equally irrelevant and off point:

* 20. When considering the **Healthprint service** with a blood test sold at a higher price than the Healthprint service without a blood test, do you think...? Select one answer only

  ○ The services are from a single company

  ○ The services are from more than one company

  ○ Does not refer to any company

  ○ Not Sure / Don't Know

The reference to a service that is sold with a blood test at a higher price than one without a blood test certainly does not translate into the respondent believing that Shaklee's specific service and YFH's specific service are connected. If this question was comprehensible at all, it likely appeared to be asking whether a single organization might offer one option with a blood test at a higher price and another option without a blood test at a lower price. It sounds reasonable that an organization would do so, but it has nothing to do with whether Shaklee's and YFH's services are confused.

The last final question that feeds into Mr. Martensen's analysis is even more far afield. Question 23 asked:

* 23. Do you think the **Healthprint** services that are sold with **and without a blood** test have similar or different...? Select one answer for each

| | Not Sure | 1- Very Different | 2 | 3 | 4 | 5 | 6 | 7 - Very Similar |
|---|---|---|---|---|---|---|---|---|
| Distributors or re-sellers | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Marketing and promotion | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |
| Consumers or end-users | ○ | ○ | ○ | ○ | ○ | ○ | ○ | ○ |

It is hard to imagine what the relevance of this question is.  Again, the reference to a service that is sold with a blood test and without a blood test certainly does not translate into the respondent believing that Shaklee's specific service and YFH's specific service are connected.  If this question was comprehensible at all, it likely appeared to be asking whether an organization might offer a service that has an option to have a blood test or not have a blood test, which does nothing to assess confusion between Shaklee's and YFH's services.

The question is also rendered irrelevant by the fact that it refers to "similar" distributors, marketers or consumers.  "Similar" is drastically different than "same" in the context of confusion.  Consumers who believe two services come from the same company could be confused.  Consumers who believe two services come from "similar" companies are not confused.  Many distinct companies could be said to be "similar" in what they do (such as generally make or distribute health-related products), but this has no bearing on the issue of trademark confusion.  Remarkably, this question counts for 50% of Mr. Martensen's analysis.

In sum, the Martensen Survey was neither a Squirt Survey nor any type of format I have seen in my career of having performed or reviewed well over 500 confusion surveys.  Rather, it immediately informed respondents that "Healthprint" is the name of a specific company and that "Heathprint" is the brand name of a specific service ("the

Healthprint service") and then asked irrelevant questions that appear to be attempts to take language from secondary meaning survey choices (single versus more than one company). Even if there were no other flaws in the survey, the results of the questions simply do not test for confusion – i.e., whether the Shaklee and YFH services emanate from the same source or affiliated/approved sources. Mr. Martensen's comparison of his results to a particular threshold for assessing likelihood of confusion is completely indefensible given that the purported threshold he refers to stems from consideration of prior surveys that asked completely different question that were actually addressed to the issue of confusion.[24]

### III.    The Martensen Survey is unreliable due to the absence of a control

Responses to most consumer surveys include some degree of survey noise or error – i.e., the tendency of respondents to give answers that do not reflect their own genuine perceptions, but that are the product of demand effects or the suggestiveness of the survey, or other survey or respondent error. Controls are a standard practice for quantifying this "noise" level or "false positive" level and deducting it from the main survey results to arrive at a reliable "net" result that has accounted for various forms of error. The use of controls is a fundamental requirement for likelihood of confusion surveys.[25] Without a control, there is no way to validate that supposed confusion

---

[24] For instance, it makes no sense at all to compare a 34.6% rate of respondents answering that a single hypothetical company would offer a service with and without a blood test to a threshold relating to what percentage of respondents believe that the Plaintiff's and Defendants' products come from the same company.

[25] Diamond, Shari Seidman. (2012) "Control Foundations: Rationales and Approaches," in Trademark and Deceptive Advertising Surveys: "Law, Science, and Design", edited by Shari Seidman Diamond and Jerre B. Swann, American Bar Association; *The Need for a Survey Control*, 6 McCarthy on Trademarks § 32:187 (4th ed. 2017). The most common form of control is a Control Group as described by McCarthy: "[A] properly constructed survey has at least two groups of respondents: one group (the "test cell") is shown the allegedly infringing mark; the second group (the "control cell") is shown a mark similar in appearance to the test cell, except for the designation whose influence is being tested." 6 McCarthy on Trademarks § 32:187

shown in the survey reflects a genuine real world likelihood of confusion, as opposed to the artificial effects of the survey. The lack of a control is another flaw that, on its own, renders the Martensen Survey entirely valueless, as there is no mechanism for determining the extent to which, if at all, the results have any reliability.

Mr. Martensen attempts to deflect this criticism in advance by opining that a control is not needed in his survey, purportedly because it is testing for the <u>presence</u> of confusion, rather than the <u>cause</u> of confusion. What Mr. Martensen is apparently saying is that it is so obvious that respondents' answers are based on the term "Healthprint" (since that is the only substantive thing mentioned) that no control is needed to determine that "Healthprint" is the cause of the result. Mr. Martensen's view reflects a fundamental lack of understanding of the most basic principles of scientific experimentation as well as consumer psychology. While it may be obvious that the only element Mr. Martensen presented is the bare term "Healthprint," there is a major alternative <u>cause</u> or explanation for the results that a control group is needed to account for – namely, all of the flaws in the survey that might produce exactly the same result even if there was no confusion at all regarding the Shaklee and YFH services.

If Mr. Martensen's position had any merit, there would be no need for a control in the classic scenario where a control is universally regarded as required – the clinical experiment. In a clinical experiment, a test group of respondents are given a pill containing a certain ingredient – for example, an ingredient hypothesized to help with pain. Based on Mr. Martensen's view, since respondents were only give a single ingredient, if 30% of respondents claim that the pill helped their pain, we don't need a control because we know the lone ingredient in the pill must be the cause. Fundamental principles of science, on the other hand, dictate that a control group is necessary, because there is actually an alternative potential cause of the result – namely, the artificial influence of the survey environment, which is well known to lead significant percentages of respondents to report that their pain was relieved even when

given a placebo.  This is why a control (or placebo) group is necessary – to determine the extent to which, if at all, the 30% result among test respondents exceeds the baseline level of "noise" or "false positive" rate.  The same phenomenon applies in likelihood of confusion surveys.  A control group in which a different term is substituted for the allegedly infringing use must be given the identical questions and instructions to test the extent to which any supposed "confusion" in the test group exceeds a baseline level of survey noise.

Another example makes obvious why Mr. Martensen's position that a control is not necessary when only testing for the "presence" not "cause" of confusion is nonsensical. Imagine the following survey question:

> Do you think BURST energy drink and BURST toothpaste are made by the same company?

If respondents answered "yes" to this question, it would be obvious that the common use of "BURST" would be the "cause" of the confusion in Mr. Martensen's terms. However, this is clearly a highly leading question that artificially places in close proximity two products (energy drink and toothpaste) that are not typically considered together in the marketplace.  It is obvious that this question risks artificially leading many respondents to answer "yes" even if real world consumers would never notice and make a mistaken connection between the two very different products.  A control is clearly necessary to attempt to account for this problem by testing what percentage of respondents would be led to answer "yes" even if a somewhat different term was used.

In fact, Mr. Martensen's view that a control is not necessary when the "cause" of supposed confusion is clear would create the perverse result that the most artificial and leading surveys would be the ones that do not need controls.  For instance, Mr. Martensen may as well have asked whether "Healthprint questionnaire" and

"Healthprint blood test" are from the same company and claimed no control is necessary because "Healthprint" would be the obvious "cause" of agreement.

Mr. Martensen unintentionally acknowledges the need for a control in his statement that controls are necessary to establish causality "or to determine the level of background noise or where biases are likely to effect responses." Even if "causality" were clear (i.e. that "Healthprint" is the cause of the result), the survey needs a control to account for the level of background noise or biases. Mr. Martensen's claim that "there is no baseline level of noise or bias" in his survey is unsupportable. His survey entails a high risk of noise or bias for all the reasons already discussed, including the failure to show any realistic marketplace conditions or ask proper confusion questions.

The Court in *Valador* that excluded the Plaintiff's survey that artificially asked about the use of "VIVE" by both parties also made clear that a control is absolutely necessary for a survey like the Martensen Survey. Although the survey in Valador literally asked whether VIVE and VIVE came from the same company (making the <u>cause</u> of any supposed confusion obvious), the Court cited the lack of a control as one of the bases for excluding the survey.[26] Mr. Martensen's survey in this case is equally deserving of rejection due to the lack of a control.

IV.   **The Martensen Survey failed to identify members of a relevant universe of prospective purchasers of services offered in connection with either party's marks**

---

[26] Valador v. HTC ("As courts routinely hold, a survey's lack of a control group or control questions constitutes yet another ground for granting a Rule 702 motion to exclude.")

It is well-accepted that a survey that fails to cover a proper universe is likely to be of no value.[27]  The proper universe for a likelihood of confusion survey consists of prospective purchasers of the type of service offered in connection with the marks at issue.  Here, that means that the proper universe consists of prospective purchasers of Shaklee's Healthprint services (in the case of forward confusion) or YFH's services (in the case of reverse confusion).

The Martensen survey failed to validate that any single survey respondent is among the relevant universe for either party's services.  The only requirement to qualify for the survey was that the respondent "purchase any health care products or services for yourself."  This is hardly different than having no screening question at all.  The vast majority of the general public purchase some health care product or service, considering that this is so broad as to include visiting a doctor or any health care professional or facility for any reason, or purchasing any number of products such as pain killers, vitamins, allergy/cold/flu medication, bandages, eye drops, or countless other over the counter and prescription products.  This question makes virtually no progress toward narrowing the general population to those who would use YFH's service – a blood test to analyze nutritional needs – or Shaklee's service – an online questionnaire used for providing personalized health recommendations.  In other words, requiring that respondents purchase "any health care products or services" does nothing to create any reasonable degree of confidence that respondents are within the relevant universe.

Even the additional criteria for the Sophisticate Consumers Group failed to identify members of the relevant universe.  One of the additional criteria was that respondents indicate that they have "purchased or used" a "health screening test" at any point in the

---

[27] See. J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (September 2007) at section 32:159 ("Selection of the proper universe is a crucial step, for even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant."); Barber, William (2012) "The Universe," in Trademark and Deceptive Advertising Surveys: Law, Science, and Design," edited by Shari Seidman Diamond and Jerre B. Swann, American Bar Association.

past.  This means that respondents met this criteria if at any point in their life they have used anything that could be considered a "health screening test."  Anyone who has ever had a doctor's appointment and filled out a paper questionnaire asking about their medical history and conditions or undergone questioning about their health by a doctor or other health care professional could answer that they have used a "health screening test."  In contrast to my survey's screening choice regarding an online questionnaire used to provide personalized health recommendations, the Martensen question about a vague "health screening test" is far from sufficient to categorize respondents as a user of the specific type of service offered by Shaklee.

The other criterion Mr. Martensen used for the Sophisticated Consumers Group is that they are at least somewhat likely to use a "blood test" in the next 12 months.  This criterion does not come close to identifying prospective purchasers of the type of service offered by YFH.  The large majority of the population would believe they use "blood tests" given the broadness of that term.  Any consumer who has had a cholesterol test or has blood drawn for any routine purpose would consider themselves to have a blood test.  There is no reason to believe that any respondent meant that they are likely to purchase a service such as YFH's blood test to analyze nutritional needs.

The data from the survey makes clear that the overly broad and vague terms "health screening test" and "blood test" led to a very overbroad sample.  56% of all respondents answered that they have used a "health screening test" and 73.1% that they are likely to use a blood test.  These figures are so high as to make clear that respondents were not understanding the terms to communicate the relatively narrow services that the parties offer.  Certainly no more than a very small percentage of the population purchases a blood test from a service like YFH to have their nutritional needs analyzed.  The fact that 73.1% answered that they are likely to use a "blood test" means that most respondents must have been thinking of some other, likely irrelevant, form of blood test, such as a routine test at a doctor's office.

Surveys that have a very overbroad universe and lack data sufficient to identify which respondents are relevant are typically of little to no value.[28]  Likewise, "surveys drawn from an overbroad universe that includes only a very small subset of relevant purchasers are unlikely to be given much weight."[29]  This is another reason that the Martensen Survey is valueless and unreliable.

## CONCLUSION ON MARTENSEN SURVEY

For the foregoing reasons, it is my opinion that the Martensen Survey is too severely flaws in multiple fundamental ways to have any value.

Hal Poret

Dated:  November 14, 2017

---

[28] Barber, William (2012) "The Universe," in Trademark and Deceptive Advertising Surveys: Law, Science, and Design," edited by Shari Seidman Diamond and Jerre B. Swann, American Bar Association (pp 40-41) (citing cases excluding or giving little or no weight to surveys with an overbroad universe that lacks data enabling a subgroup of relevant consumers to be identified).

[29] Id. at 41.

**THE FOLLOWING APPENDICES PROVIDED SEPARATELY:**

**APPENDIX A – CURRICULUM VITAE OF STUDY'S AUTHOR**
**APPENDIX B – QUESTIONNAIRE**
**APPENDIX C – SCREENSHOTS OF PROGRAMMED SURVEY**
**APPENDIX D – DATA FILE**

## Hal L. Poret (hal.inc42@gmail.com; 914-772-5087)

### *Education*

1998        Harvard Law School, J.D., *cum laude*
- Editor/Writer – Harvard Law Record
- Research Assistant to Professor Martha Minow

1995        S.U.N.Y. Albany, M.A. in Mathematics, *summa cum laude*
- Statistics
- Taught calculus/precalculus/statistics

1993        Union College, B.S. in Mathematics with honors, *magna cum laude*
- Phi Beta Kappa
- Resch Award for Achievement in Mathematical Research

### *Employment*

2016 -        President, Hal Poret LLC
- Design, supervise, and analyze consumer surveys, including Trademark, Trade Dress, Advertising Perception, Consumer Deception, Claims Substantiation studies, Damages, and Corporate Market Research Surveys
- Consulting regarding survey design and review of other surveys
- Provided expert testimony at deposition and/or trial regarding survey research in over 100 U.S. District Court litigations and proceedings in front of TTAB, NAD, FTC and FCC.

2004  - 2015   Senior Vice President, ORC International
- Designed, supervised, and analyzed consumer surveys in legal and corporate market research areas, and provided expert testimony regarding survey research in legal cases.

2003 – 2004   Internet Sports Advantage
- Developed and marketed proprietary internet sports product, and licensed trademark and intellectual property rights.

1998 – 2003   Attorney, Foley Hoag & Eliot, Boston, MA
- Represented corporations and individuals in trademark, trade dress, advertising, product, and related legal disputes.
- Worked with survey experts in developing and using surveys as evidence in trademark, trade dress and advertising disputes.

*Testimony at Trial or by Deposition Past 4 Years*

(Party who retained me shown in bold)

2017   Rovi v. **Comcast**
       (Deposition)                           USDC Southern District of NY

2017   Puma v. **Black & Decker**             New Mexico Circuit Court
       (Trial)

2017   **Select Comfort v.** Personal Comfort
       (Trial and Deposition)                 USDC District of Minn

2017   **Alzheimer's Foundation of America** v. Alzheimer's Association
       (Deposition and trial)                 USDC Southern District of NY

2017   **Banc of California** v. Farmers & Merchants Bank
       (Deposition)                           USDC Central District of CA

2017   PolyGroup v. **Willis Electric**
       (Deposition)                           Patent Trial and Appeal Board

2017   In re: NCAA Grant-in-Aid Cap Litigation
       (Deposition)                           USDC Northern District of CA

2017   Mullins v. **Premier Nutrition**       USDC Northern District of CA
       (Depositions in Class Cert and Merits phases)

2017   Lion's Gate v. **TD Ameritrade**
       (Deposition)                           USDC Central District of CA

2017   **Deere & Company** v. Fimco dba Schaben
       (Deposition and trial)                 USDC Western District of KY

2017   **Adidas & Reebok** v. TRB
       (Deposition)                           USDC District of Oregon

2017   **Church & Dwight** v. SPD             USDC Southern District of NY
       (Deposition/trial in liability phase; deposition in damages phase)

2017   In re: **Coca Cola** Marketing and Sales Practices Litigation (No. II)
       (Deposition)                           USDC Northern District of CA

2017  **Ducks Unlimited** v. Boondux LLC and Caleb Sutton
      (Deposition and Trial)                    USDC Western District of TN

2017  Globefill v. **Element Spirits**
      (Deposition and Trial)                    USDC Central District of CA

2017  Brickman v. **Fitbit**
      (Deposition)                              USDC Northern District of CA

2017  Network-1 Technologies v. **Alcatel-Lucent et al.**
      (Deposition)                              USDC Eastern District of TX

2017  Health Partner Plans v. **Reading Health Partners**
      (Deposition and Injunction hearing)       USDC Eastern District of PA

2017  In Re **Biogen** '755 Patent Litigation
      (Deposition)                              USDC District of NJ

2017  **Cava Mezze** v. Mezze Mediterranean Grill
      (Trial)                                   USDC District of MD

2017  Mastrandrea v. **Vizio**
      (Deposition)                              USDC Central District of CA

2017  **Adidas** v. Skechers                    USDC District of OR
      (Deposition and Injunction hearing)

2016  **Triumph International, Inc.** v. Gourmetgiftbaskets.com, Inc.
      (Deposition)                              USDC Central District of CA

2016  Phelan Holdings v. **Rare Hospitality Management**
      (Deposition)                              USDC Middle District of FL

2016  **Intellectual Ventures II** v. AT&T Mobility
      (Deposition)                              USDC District of DE

2016  **One World Foods** v. Stubbs Austin Restaurant Company
      (Deposition)                              USDC Western District of TX

2016  **Booking.com B.V.** v. Michelle Lee
      (Deposition)                              USDC Eastern District of VA

2016  Variety Stores v. **Walmart Stores, Inc.**

(Trial)                                          USDC Eastern District of NC

2016   **American Cruise Lines** v. American Queen Steamboat Company
       (Deposition)                              USDC District of DE

2016   Universal Church v. **Univ. Life Church**  USDC Southern District of NY
       (Deposition)

2016   **U. of Houston** v. Houston Col. of Law   USDC Southern District of TX
       (Deposition)

2016   Navajo Nation v. **Urban Outfitters**      USDC District of NM
       (Daubert Hearing)

2016   Beaulieu v. **Mohawk Carpet Dist.**        USDC Northern District of GA
       (Deposition)

2016   Efficient Frontiers v. **Reserve Media**   USDC Central District of CA
       (Deposition)

2016   **McAirlaids** v. Medline Industries       USDC Eastern District of VA
       (Deposition)

2016   **Under Armour** v. Ass Armor             USDC Southern District of FL
       (Deposition)

2016   **C5 & CoorsTek** v. CeramTec             USDC District of Colorado
       (Deposition and trial)

2016   **BBC** v. Stander                        USDC Central District of CA
       (Deposition)

2016   **Caterpillar** v. Tigercat               USPTO Opposition
       (Deposition)

2016   Premier v. **Dish Network**               USPTO Opposition
       (Deposition)

2016   **Omaha Steaks** v. Greater Omaha         USPTO Opposition
       (Rebuttal Testimony)

2016   **EMC** v. Pure Storage                   USDC District of MA
       (Deposition)

| 2016 | **Top Tobacco** v. North Atlantic (Deposition) | USPTO Opposition |
|---|---|---|
| 2016 | Ascension Health v. **Ascension Ins.** (Deposition) | USDC Eastern District of MO |
| 2016 | **Quoc Viet** v. VV Foods (Deposition and trial) | USDC Central District of CA |
| 2016 | Joules v. **Macy's Merchandising Group** (Deposition and trial) | USDC Southern District of NY |
| 2015 | MMG v. **Heimerl & Lammers** (Deposition and trial) | USDC District of MN |
| 2015 | **PRL USA** v. Rolex (Deposition) | USDC Southern District of NY |
| 2015 | Bison Designs v. **Lejon** (Deposition) | USDC District of CO |
| 2015 | Barrera v. **Pharmavite** (Deposition) | USDC Central District of CA |
| 2015 | **Flowers** v. Bimbo Bakeries (Deposition) | USDC Middle District of GA |
| 2015 | Razor USA v. **Vizio** (Deposition) | USDC Central District of CA |
| 2015 | Allen v. **Simalasan** (Deposition) | USDC Southern District of CA |
| 2015 | BMG Rights Mgmt. v. **Cox Enterprises** (Deposition and trial) | USDC Eastern District of VA |
| 2015 | Verisign v. **XYZ.COM LLC** (Deposition) | USDC Eastern District of VA |
| 2017 | **Select Comfort v.** Personal Comfort (Trial and Deposition) | USDC District of Minn |

| | | |
|---|---|---|
| 2015 | Farmer Boys v. **Farm Burger** (Deposition) | USDC Central District of CA |
| 2015 | Ono v. **Head Racquet Sports** (Deposition) | USDC Central District of CA |
| 2015 | **Select Comfort v.** Tempur Sealy (Deposition) | USDC District of Minn |
| 2015 | ExxonMobil v. **FX Networks** (Deposition) | USDC Southern District of TX |
| 2015 | **Delta** v. Network Associates (Deposition) | USDC Middle District of FL |
| 2015 | Brady v. **Grendene** (Deposition) | USDC Central District of CA |
| 2015 | **Zippo** v. LOEC (Deposition) | USDC Central District of CA |
| 2015 | Maier v. **ASOS** (Deposition) | USDC District of Maryland |
| 2015 | **Converse** In re: Certain Footwear (Deposition and trial) | International Trade Commission |
| 2014 | Scholz v. **Goudreau** (Deposition) | USDC District of Mass |
| 2014 | **Economy Rent-A-Car** v. Economy Car Rentals (TTAB Testimony) | USPTO |
| 2014 | Weber v. **Sears** (Deposition) | USDC Northern District of IL |
| 2014 | Native American Arts v. **Stone** (Deposition) | USDC Northern District of IL |
| 2014 | Gravity Defyer v. **Under Armour** (Trial) | USDC Central District of CA |
| 2014 | **Adams** v. Target Corporation | USDC Central District of CA |

(Deposition)

| | | |
|---|---|---|
| 2014 | PODS v. **UHAUL**<br>(Deposition and trial) | USDC Middle District of FL |
| 2014 | Flushing v. **Green Dot Bank**<br>(Deposition) | USDC Southern District of NY |
| 2014 | Amy's Ice Creams v. **Amy's Kitchen**<br>(Deposition) | USDC Western District of TX |
| 2014 | **Unity Health** v. UnityPoint<br>(Deposition) | USDC Western District of WI |
| 2014 | In re: NCAA Student-athlete litigation<br>(Deposition and Trial) | USDC   Northern District of CA |
| 2014 | Spiraledge v. **SeaWorld**<br>(Deposition) | USDC Southern District of CA |
| 2014 | **Diageo N.A. v.** Mexcor<br>(Deposition and trial) | USDC Southern District of TX |
| 2014 | **Pam Lab** v. Virtus Pharmaceutical<br>(Deposition and trial) | USDC   Southern District of FL |
| 2014 | **US Soccer Federation** v. Players Ass'n<br>(Arbitration Testimony) | Arbitration |
| 2014 | **Estate of Marilyn Monroe** v. AVELA<br>(Deposition) | USDC Southern District of NY |
| 2014 | Kelly-Brown v. **Winfrey, et al.**<br>(Deposition) | USDC Southern District of NY |
| 2014 | Virco Mfg **v. Hertz & Academia**<br>(Deposition) | USDC Central District of CA |
| 2014 | In re: Hulu Privacy Litigation<br>**(Deposition)** | USDC Northern District of CA |
| 2013 | **Jackson Family Wines** v. Diageo<br>(Deposition) | USDC Northern District of CA |

| 2013 | Bubbles, Inc. v. **Sibu, LLC.** (Deposition) | USDC Eastern District of VA |
| 2013 | Clorox v. **Industrias Dalen** (Deposition) | USDC Northern District of CA |
| 2013 | Active Ride Shop v. **Old Navy** (Deposition and trial) | USDC Central District of CA |
| 2013 | **Macy's Inc**. v. Strategic Marks LLC. (Deposition) | Northern District of CA |
| 2013 | Karoun Dairies, Inc. v. **Karoun Dairies, Inc.** (Deposition) | Southern District of CA |
| 2013 | **Kraft Foods** v. Cracker Barrel Old Country (Deposition and Trial) | Northern District of IL |
| 2013 | **Bayer Healthcare** v. Sergeants Pet Care USDC (Deposition and Trial) | Southern District of NY |
| 2013 | JJI International v. **The Bazar Group, Inc.** (Deposition) | USDC District of RI |
| 2013 | **Fage Dairy USA** v. General Mills (Deposition) | Northern District of NY |
| 2013 | Gameshow Network v. **Cablevision** (Deposition and trial) | F.C.C. |
| 2013 | Telebrands v. **Meyer Marketing** (Deposition) | USDC Eastern District of CA |
| 2012 | Marketquest v. **BIC** (Deposition) | USDC Southern District of CA |
| 2012 | **Hornady** v. DoubleTap (Deposition) | USDC District of Utah |
| 2012 | **Briggs/Kohler** Opposition to Honda (Deposition) | TTAB |

| | | |
|---|---|---|
| 2012 | **Apple** v. Samsung (Deposition and Trial) | USDC Northern District of CA |
| 2012 | Forest River v. **Heartland** (Deposition) | USDC Northern District of IN |
| 2012 | SPD v. **Church & Dwight** (Deposition) | USDC District of NJ |
| 2012 | Brighton Collectibles v. **Texas Leather** (Deposition) | USDC Southern District of CA |
| 2012 | **Cytosport** v. Vital Pharmaceuticals (Deposition) | USDC Eastern District of CA |
| 2012 | Authors Guild v. **Google** (Deposition) | USDC Southern District of NY |
| 2012 | Clear Choice v. **Real Choice** (Opposition testimony) | TTAB |
| 2011 | **Borghese** v. Perlier et al. (Deposition) | USDC Southern District of NY |
| 2011 | My Favorite Company v. **Wal-Mart** (Deposition) | USDC Central District of CA |
| 2011 | **PepsiCo** v. Pirincci (Opposition testimony) | TTAB |
| 2011 | **GAP Inc.** v. G.A.P. Adventures (Trial) | USDC Southern District of NY |
| 2011 | **Merck Eprova** v. Brookstone (Deposition and trial) | USDC Southern District of NY |
| 2011 | Wella, Inc. v. **Willagirl LLC** (Deposition) | USDC Southern District of NY |
| 2011 | Bauer Bros. v. **Nike** (Deposition) | USDC Southern District of CA |
| 2011 | **Aviva Sports** v. Manley | USDC District of Minnesota |

(Deposition)

2011 **American Express** v. Black Card LLC        USDC Southern District of NY
     (Deposition)

2011 Gosmile v. **Dr. Levine**                         USDC Southern District of NY
     (Preliminary Injunction Trial)


### Presentations

What's New in Advertising Law, Claim Support and Self-Regulation?
(ABA Seminar, November 17, 2015)

How Reliable is Your Online Survey
(2015 ASRC Annual Conference, September 29, 2015)

What Do Consumers Think?  Using Online Surveys to Demonstrate Implied Claims
(ANA Advertising Law and Public Policy Conference, April 1, 2015)

Cutting Edge Developments in Trademark Surveys (Rocky Mountain Intellectual
Property & Technology Institute, May 30, 2013)

Using Survey Experts in Trademark Litigation (DRI Intellectual Property Seminar, May
9, 2013)

Surveys in Trademark and Advertising Litigation  (2013 National CLE Conference,
Snowmass Colorado, January 2013)

Internet Survey Issues (PLI Hot Topics in Advertising Law Conference, March 2012)

Measuring Consumer Confusion Through Online Surveys (2011 Midwest IP Institute)
(September, 2011)

Online Surveys as Evidence in Trademark Disputes (International Trademark
Association Annual Conference, May 2011)

Managing Intellectual Property Trademark Roundtable (April 7, 2010)

Recent Trends in Trademark Surveys (Virginia State Bar Intellectual Property
Conference, October 2009)

Trademark Surveys in US Litigation (presentation for International Trademark Association Annual Conference) (May 2009)

How to Conduct Surveys for use in Trademark Disputes (Practicing Law Institute Advanced Trademark Law Conference) (May 2009)

Trademark and Advertising Perception Studies for Legal Disputes (Opinion Research Corporation Seminar, June 2008)

Understanding Advertising Perception Surveys (Promotions Marketing Association Annual Law Conference) (November 2007)

Designing and Implementing Studies to Substantiate Advertising Claims (American Conference Institute Claims Substantiation Conference, October 2007)

Surveys in Trademark and False Advertising Disputes (InfoUSA Webinar, June 2007)

Measuring Consumer Perception in False Advertising and Trademark Cases, (multiple presentations) (2007)

Potential Errors to Avoid In Designing a Trademark Dilution Survey (American Intellectual Property Association paper, April 2007)

Consumer Surveys in Trademark and Advertising Cases (presentation at Promotions Marketing Association Annual Law Conference) (December 2006)

Use of Survey Research and Expert Testimony in Trademark Litigation, (International Trademark Association Annual Conference, May 2006)

Survey Research as Evidence in Trademark/Trade Dress Disputes (multiple presentations) (2006)

Using Surveys to Measure Secondary Meaning of Trade Dress, Legal Education Seminar, Boston, April 2006


*Publications/Papers*

Cutting Edge Developments in Trademark Surveys (Rocky Mountain Intellectual Property & Technology Institute, May 2013)

Hot Topics and Recent Developments in Trademark Surveys (paper for May 2013 DRI Intellectual Property Conference)

Surveys in Trademark and Advertising Litigation (2013 National CLE Conference, Snowmass Colorado, January 2013)

Trademark Litigation Online Consumer Surveys (Practical Law Company Intellectual Property and Technology, May 2012)

Hot Topics in Advertising Law 2012 (Contributor to Practising Law Institute publication)

A Comparative Empirical Analysis of Online Versus Mall and Phone Methodologies for Trademark Surveys, 100 TMR 756 (May-June 2010)

Recent Trends in Trademark Surveys (paper for Virginia State Bar Intellectual Property conference, October 2009)

Trademark Dilution Revision Act breathes new life into dilution surveys (In Brief PLI website, June 2009)

The Mark (Survey Newsletter; three editions 2009)

Hot Topics in Trademark Surveys (paper for Practicing Law Institute Advanced Trademark Law Conference) (May 2009)

The Mark (Survey Newsletter, 2008)

Trademark and Advertising Survey Report (Summer 2007)

Avoiding Pitfalls in Dilution Surveys under TDRA (AIPLA Spring Conference, Boston, May 2007)


### Commentary

Comment on Hotels.com case (on TTABLOG.COM, July 24, 2009)

Comment on Nextel v. Motorola (on TTABLOG.COM, June 19, 2009)

PLI All-Star Briefing Newsletter, "What does the Trademark Dilution Revision Act mean for the future of Dilution Surveys?" (June 2009)

*Professional Memberships/Affiliations*

American Association of Public Opinion Research

International Trademark Association

National Advertising Division of Council of Better Business Bureaus

| SCREENER |
| --- |

**BASE: ALL RESPONDENTS**
Q99    Insert Captcha [HIDE "YOU ARE HUMAN" SCREEN]

**BASE: ALL RESPONDENTS**
Q100.  Please enter your year of birth. **[PROGRAMMER: DROP DOWN MENU.
TERMINATE IF DOES NOT MATCH PANELIST'S PRELOAD.]**

**ASK IF: HAS NOT TERMINATED**
Q105   Are you… **[CHECK AGAINST PANEL VARIABLE AND TERMINATE
IF IT DOES NOT MATCH]**
1. Male [PROGRAMMER: FOR PANEL VARIABLE PLEASE ASSIGN
VALUE OF "1" FOR MALE]
2. Female [PROGRAMMER: FOR PANEL VARIABLE PLEASE ASSIGN
VALUE OF "2" FOR FEMALE]

**ASK IF: HAS NOT TERMINATED**
Q107   Which of these age ranges includes your age?
**[TERMINATE IF UNDER 21 OR AGE RANGE NOT POSSIBLE BASED
ON YEAR OF BIRTH ENTERED IN Q100. NOTE – Each respondent can
have two possible ages depending on if respondent's birthday has
passed.]**
1. Under 21 [TERMINATE]
2. 21-34
3. 35-54
4. 55 or older

**BASE: ANY NON-TERMINATES**

Q109   Which of the following web browsers or search engines, if any, have you used in the past 3 months?

*Please select all that apply.*
[RANDOMIZE]
1. Google Chrome
2. Internet Explorer
3. Microsoft Edge
4. Bing
5. Yahoo
6. Firefox
7. Opera
8. Hagelin
9. Other **[ANCHOR]**
10. Not sure **[ANCHOR; EXCLUSIVE]**

**[Terminate if selects 109-8 or if selects all of 109-1 through 7]**

**ASK IF: HAS NOT TERMINATED**

Q110   In what state do you live?
**[PROGRAMMER: Drop down menu of states plus D.C. Include an option for "Other" and terminate if it is selected.]**

**ASK IF: HAS NOT TERMINATED**

Q120   Do you or does anyone in your household work in either advertising or market research?
*(Select all that apply)*
[RANDOMIZE]
1. Yes, advertising **[TERMINATE]**
2. Yes, market research **[TERMINATE]**
3. No, neither of these **[ANCHOR; EXCLUSIVE]**

**ASK IF: HAS NOT TERMINATED**

Q130   Which of the following type of health-related services or products, if any, would you consider using in the next 2 years?
*(Select all that apply)*
[RANDOMIZE]
1.   Blood-testing to analyze your nutritional needs
2.   Online questionnaire for providing you personalized health recommendations
3.   Purchase of nutritional supplements
4.   Gastric band surgery for weight loss
5.   Online reviews and information about physicians
6.   Laser removal of tattoos
7.   None of these **[ANCHOR; EXCLUSIVE]**

**[MUST SELECT OPTION 130=1 TO CONTINUE; OTHERWISE, TERMINATE.]**

**ASK IF: HAS NOT TERMINATED**

Q160   For quality assurance, please type the word "blue" in the blank next to the "Other" box below and then click to continue.

1.   Strongly agree
2.   Agree
3.   Neutral
4.   Disagree
5.   Strongly disagree
6.   Other _____ [DO NOT FORCE TEXT BOX]

**[TERMINATE IF SELECTED 160/1-5 OR DOES NOT TYPE IN AN ANSWER. ALLOW RESPONDENT TO CONTINUE IF THEY TYPE IN AN ANSWER, REGARDLESS OF WHAT THEY TYPE.]**

**ASK IF: HAS NOT TERMINATED**

Q170   For this survey you will need to spend several minutes reviewing pages from websites so you can answer some brief questions.
Do you agree to spend the time required to review the webpage images?

1.   Yes, I agree
2.   No, I do not agree
3.   Don't know

**[MUST SELECT 170=1 TO CONTINUE; OTHERWISE, TERMINATE.]**

## ASK IF: HAS NOT TERMINATED

Q180   Before continuing, please carefully read these additional instructions:

*     Please take the survey in <u>one</u> session without interruption.
*     Please keep your browser window maximized for the entire survey
*     Please answer all questions on your own
*     Please do not consult any website or other materials while taking the survey
*     If you normally wear eye glasses or contact lenses when viewing a computer screen, please wear them for the survey.

    1.   I understand and agree to the above instructions
    2.   I do not understand or do not agree to the above instructions **[TERMINATE]**

[ONLY QUALIFIED RESPONDENTS BEYOND THIS POINT. EACH RESPONDENT SHOULD BE ASSIGNED TO ONLY ONE ONE CELL. RANDOMIZE CELL ASSIGMENT, BUT PRIORITIZE BASED ON NEED TO MEET AGE/GENDER QUOTAS.]

**[PROGRAMMING NOTE: DISPLAY ANY TEXT WITH ITS OWN QUESTION NUMBER ON A SCREEN BY ITSELF]**

| MAIN SURVEY |
| --- |

## ASK: ALL

200.   The remaining part of the survey has three sections.  For the first section, we are going to show you several screens from a website.

    Please review the website as you would if you were considering using the service you will see on the coming screens.

## ASK: ALL

210.   Below is a page from the website.  Please take your time to review it and scroll up and down as necessary to review the full page.

[PROGRAMMING: DISPLAY IMAGE 1000 FOR CELL 1 OR IMAGE 2000 FOR CELL 2.  DISPLAY LARGE ENOUGH TO COVER THE SCREEN AS A REAL WEBPAGE WOULD APPEAR]

[DO NOT ENABLE CONTINUE BUTTON FOR FIRST 15 SECONDS]

**[WHILE THE CONTINUE BUTTON IS DISABLED, INCLUDE THE FOLLOWING LINE BENEATH THE IMAGE:]** You will be able to continue after a minimum of 15 seconds has passed.**]**

**[PROGRAMMING: AFTER 15 SECONDS, THEN <u>REPLACE</u> THE ABOVE LINE WITH THE FOLLOWING TEXT AND RESPONSE OPTIONS.]**

Before continuing with the survey, please indicate whether or not you were able to view the webpage clearly.

1.  I viewed the webpage clearly
2.  I was unable to view the webpage clearly [TERMINATE; DO NOT COUNT AS COMPLETE]

**<u>BASE: QUALIFIED RESPONDENTS</u>**
Q220  On the next screen you will be shown a number of additional pages that a customer would see on the website as they answer questions and provide information the website asks for.  (You will not be asked to enter any information, only to view the screens.)

You will need to click the green arrows to the side of each page to view all pages before you can continue with the survey.  You may scroll back and forth to view each page on the website as many times as you like.

Please take your time to view the pages as you ordinarily would if you were considering using the service offered on the website.

**<u>BASE: QUALIFIED RESPONDENTS</u>**
Q230  Please use the green arrows to advance to view 12 pages from the website.

[IF CELL 1: DISPLAY IMAGES 1001 – 1012 IN THAT ORDER SO THAT RESPONDENTS CAN SEE THEM ONE AT A TIME AND SCROLL THROUGH.
[IF CELL 2: DISPLAY IMAGES 2001 – 2012 IN THAT ORDER SO THAT RESPONDENTS CAN SEE THEM ONE AT A TIME AND SCROLL THROUGH]

[PROGRAMMING: PROGRAM EACH IMAGE SO THAT IT APPEARS LARGE ENOUGH ON SCREEN FOR RESPONDENTS TO READ ALL TEXT IN THE IMAGE. PROGRAM ARROWS TO THE SIDE OF EACH IMAGE SO RESPONDENTS CAN MANEUVER BACK AND FORTH BETWEEN IMAGES. PLACE THESE ARROWS ABOUT 1/3 FROM THE TOP OF THE IMAGES.

RESPONDENTS MAY GO BACK AND FORTH BETWEEN IMAGES. DISABLE
CONTINUE BUTTON UNTIL LAST IMAGE HAS BEEN VIEWED]

[WHILE THE CONTINUE BUTTON IS DISABLED, INCLUDE THE
FOLLOWING LINE AT THE BOTTOM OF THE SCREEN: "You will be able to
continue with the survey after all 12 screens have been viewed." AFTER THE
FINAL IMAGE HAS BEEN VIEWED, REPLACE THE ABOVE LINE WITH THE
FOLLOWING INSTRUCTION AND RESPONSE OPTIONS.]

Before continuing with the survey, please indicate whether or not you
were able to view all of the webpages clearly.

1. I viewed all the webpages clearly

2. I was unable to view all the webpages clearly [TERMINATE; DO NOT
COUNT AS COMPLETE]

<u>ASK: ALL</u>
240.   Below is the page on which you can purchase services offered on the
website.  Please take your time to review it and scroll up and down as
necessary to review the full page.

[PROGRAMMING: DISPLAY IMAGE 1013 FOR CELL 1 OR IMAGE 2013 FOR
CELL 2.  DISPLAY LARGE ENOUGH TO COVER THE SCREEN AS A REAL
WEBPAGE WOULD APPEAR]

[DO NOT SHOW CONTINUE BUTTON AND ANSWER CHOICES UNTIL
IMAGE IS DISPLAYED FOR 15 SECONDS]

**[WHILE THE CONTINUE BUTTON IS DISABLED, INCLUDE THE
FOLLOWING LINE BENEATH THE IMAGE:]** You will be able to continue
after a minimum of 15 seconds has passed**.]**

**[PROGRAMMING: AFTER 15 SECONDS, THEN <u>REPLACE</u> THE ABOVE
LINE WITH THE FOLLOWING TEXT AND RESPONSE OPTIONS.]**

Before continuing with the survey, please indicate whether or not you
were able to view the webpage clearly.

1. I viewed the webpage clearly

2. I was unable to view the webpage clearly [TERMINATE; DO NOT
COUNT AS COMPLETE]

**ASK: ALL**

310.   **PLEASE READ INSTRUCTION CAREFULLY**

This concludes the **first section** of the survey.

If later in the survey you are asked about the website you were shown in the first section of the survey, we are referring to the website that we just had you review.

**ASK: ALL**

320.   For the second section of the survey, we would like to ask you a few brief questions relating to general health.

Which of the following, if any, do you regularly do (during relevant times of the year)?

*(Please select all that apply or none)*
**[RANDOMIZE]**
1.   Exercise/workout
2.   Participate in organized sports
3.   Take vitamins
4.   Use sunscreen
5.   Have an annual check-up with a physician
6.   None of these **[Exclusive]**

**ASK: ALL**

325.   Through which of the following, if any, do you have health insurance?

*(Please select all that apply or none)*
1.   Your employer
2.   A family member's employer
3.   Private insurance (not through an employer)
4.   Medicare
5.   Medicaid
6.   None of these **[Exclusive]**

**ASK: ALL**

330.   Which of the following, if any, apply to you?

*(Please select all that apply or none)*
1. Vegan
2. Vegetarian
3. Gluten-free
4. Dairy-free
5. Have food allergies
6. Follows low carb diet
7. None of these **[Exclusive]**

**ASK: ALL**

340.   Do you or does anyone else in your household work in the area of health services or healthcare?

1. Yes
2. No

**ASK: ALL**

350.   For the third and final section of the survey, you will be shown websites for several services. For each one website, you will need to click on green arrows to the side of the page to view three pages from the website. For each website, please look at the webpages as you would if you were considering using the advertised service.

You will be asked some questions about each website. For any question, if you do not have an opinion, please indicate so. Please do not guess.

[PROGRAMMING: REPEAT Q360-Q375 SERIES THREE TIMES, UNTIL IT HAS BEEN ASKED ONCE FOR EACH OF IMAGE SERIES: 3001-3, 4001-3, 5001-3. RANDOMIZE WHICH IMAGE SERIES IS SEEN 1ST, 2ND OR 3RD.]

**ASK: ALL**

360.   Please review the three webpages from the following website and then answer the question that will appear below after you review the three pages.

[PROGRAMMING: DISPLAY IMAGE SERIES WITH GREEN ARROWS TO THE SIDE SO RESPONDENT CAN ADVANCE THROUGH ALL THREE IMAGES.
[DO NOT SHOW QUESTION AND ANSWER CHOICES UNTIL THIRD IMAGE APPEARS.]

[FOR EACH OF THE FIRST TWO IMAGES, DO NOT ENABLE THE GREEN ARROWS TO ADVANCE TO THE NEXT IMAGE UNTIL THE IMAGE HAS BEEN ON SCREEN FOR 15 SECONDS.  DURING THIS DELAY, INCLUDE THE FOLLOWING LINE BENEATH THE IMAGE:]
You will be able to advance to the next image after a minimum of 15 seconds has passed.]
[AFTER THE THIRD IMAGE APPEARS, REPLACE THE ABOVE LINE WITH THE FOLLOWING TEXT AND RESPONSE OPTIONS.]

Do you think that the services offered on this website are from…

**[The first time Q360 is asked randomize order of choices 1 and 2; any subsequent time this question is asked response options should appear in the same order in which they first appeared.]**

1.  The same company as the website you were shown in the first section of the survey
2.  A different company than the website you were shown in the first section of the survey
3.  No opinion/don't know
4.  I am unable to view the webpages clearly [TERMINATE – DO NOT COUNT AS COMPLETE]

ASK IF: 360=1
365.  [PROGRAMMING: REPEAT IMAGE SERIES SHOWN IN Q360 WITH GREEN ARROWS ACTIVATED SO RESPONDENTS CAN USE THEM IF DESIRED.  NO TIME DELAY OR REQUIREMENT TO VIEW ALL THREE IMAGES IS IMPOSED HERE]
Please explain in as much detail as possible what makes you think that the services offered on this website are from the same company as the website you were shown in the first section of the survey?
[INSERT LARGE TEXT BOX. FORCE RESPONSE.]

ASK IF: DIFFERENT OR NO OPINION (Q360=2,3)

370.   [PROGRAMMING: REPEAT IMAGE SERIES SHOWN IN Q360 WITH
GREEN ARROWS ACTIVATED SO RESPONDENTS CAN USE THEM
IF DESIRED. NO TIME DELAY OR REQUIREMENT TO VIEW ALL
THREE IMAGES IS IMPOSED HERE]
**[List 1/2 in the same order as in 360]**
Do you think the services offered on this website…

1.  <u>are</u> affiliated with, or sponsored or approved by, the company whose
    website you were shown in the <u>first section</u> of the survey
2.  are <u>not</u> affiliated with, or sponsored or approved by, the company
    whose website you were shown in the <u>first section</u> of the survey
3.  No opinion/don't know
4.  I am unable to view the webpage clearly [TERMINATE – DO NOT
    COUNT AS COMPLETE]

ASK IF: 370=1

375.   [PROGRAMMING: REPEAT IMAGE SERIES SHOWN IN Q360 WITH
GREEN ARROWS ACTIVATED SO RESPONDENTS CAN USE THEM
IF DESIRED. NO TIME DELAY OR REQUIREMENT TO VIEW ALL
THREE IMAGES IS IMPOSED HERE]
Please explain in as much detail as possible what makes you think the
services offered on this website are affiliated with, or sponsored or
approved by, the company whose website you were shown in the <u>first
section</u> of the survey.
[INSERT LARGE TEXT BOX. FORCE RESPONSE.]

[PROGRAMMING: REPEAT Q360-Q375 UNTIL ALL 3 IMAGE SERIES
HAVE BEEN SHOWN (i.e.: IMAGE 3001-3, 4001-3, 5001-3), THEN END
SURVEY. WHEN REPEATING QUESTIONS, LIST ANSWER
CHOICES IN THE SAME ORDER AS FOR THE FIRST IMAGE
SERIES. IN THE DATA SHOW SEPARATE TABLES FOR EACH
SERIES OF IMAGES SHOWN – E.G. IMAGE SERIES 3001-3 SHOULD
HAVE A TABLE FOR Q360, A TABLE FOR Q365, A TABLE FOR Q370
AND A TABLE FOR 375. IMAGE SERIES 4001-3 AND 5001-3 SHOULD
ALSO EACH HAVE THEIR OWN TABLES FOR EACH QUESTION.
CLEARLY LABEL THE TABLES TO SHOW WHICH TABLE'S
RESULTS ARE FOR WHICH IMAGE SERIES.]

Appendix C: Screenshots



Appendix C: Screenshots

## Q109



## Q110

## Q120



Appendix C: Screenshots

Q130



Q160



Appendix C: Screenshots

## Q170



For this survey you will need to spend several minutes reviewing pages from websites so you can answer some brief questions.

**Do you agree to spend the time required to review the webpage images?**
Please select one

Yes, I agree

No, I do not agree

Don't know

Continue »

Privacy Policy - Help

## Q180

Before continuing, please carefully read these additional instructions:

- Please take the survey in one session without interruption.
- Please keep your browser window maximized for the entire survey
- Please answer all questions on your own
- Please do not consult any website or other materials while taking the survey
- If you normally wear eye glasses or contact lenses when viewing a computer screen, please wear them for the survey.

Please select one

I understand and agree to the above instructions

I do not understand or do not agree to the above instructions

Continue »

Privacy Policy - Help

Appendix C: Screenshots

| MAIN SURVEY |
| --- |

Q200.



The remaining part of the survey has three sections. For the first section, we are going to show you several screens from a website.

Please review the **website as you** would if you were considering using the service you will see on the coming screens.

Continue »

Privacy Policy - Help

Appendix C: Screenshots

## Q210.  CELL 1



Appendix C: Screenshots

Q210.  CELL 2



Appendix C: Screenshots

Q220

On the next screen you will be shown a number of additional pages that a customer would see on the website as they answer questions and provide information the website asks for. (You will not be asked to enter any information, only to view the screens.)

You will need to click the green arrows to the side of each page to view all pages before you can continue with the survey. You may scroll back and forth to view each page on the website as many times as you like.

Please take your time to view the pages as you ordinarily would if you were considering using the service offered on the website.

Continue »

Privacy Policy - Help

Appendix C: Screenshots

Q230   CELL 1: IMAGES 1001 – 1012



Appendix C: Screenshots



Appendix C: Screenshots



Appendix C: Screenshots



Appendix C: Screenshots



Appendix C: Screenshots



Appendix C: Screenshots



Appendix C: Screenshots



Appendix C: Screenshots



Appendix C: Screenshots



Appendix C: Screenshots



Appendix C: Screenshots



Appendix C: Screenshots



Q230   CELL 2: IMAGES 2001 – 2012



Appendix C: Screenshots



Please use the green arrows to advance to view 12 pages from the website.

Your Personalized Health Builder

2 OF 12 IMAGES

You will be able to continue with the survey after all 12 screens have been viewed.

Appendix C: Screenshots



Appendix C: Screenshots



Appendix C: Screenshots



Appendix C: Screenshots



Appendix C: Screenshots



Appendix C: Screenshots



Appendix C: Screenshots



Appendix C: Screenshots



Appendix C: Screenshots



Appendix C: Screenshots



Appendix C: Screenshots

## Q240   CELL 1



Appendix C: Screenshots



Appendix C: Screenshots

## Q240   CELL 2





## Q310



Appendix C: Screenshots

Q320



For the second section of the survey, we would like to ask you a few brief questions relating to general health.

Which of the following, if any, do you regularly do (during relevant times of the year)?
*Please select all that apply or none*

- Have an annual check-up with a physician
- Participate in organized sports
- Use sunscreen
- Take vitamins
- Exercise/workout
- None of these

Continue »

Q325

Through which of the following, if any, do you have health insurance?
*Please select all that apply or none*

- Your employer
- A family member's employer
- Private insurance (not through an employer)
- Medicare
- Medicaid
- None of these

Continue »

Privacy Policy - Help

Q330



Q340



Q350

For the third and final section of the survey, you will be shown websites for several services. For each one website, you will need to click on green arrows to the side of the page to view three pages from the website. For each website, please look at the webpages as you would if you were considering using the advertised service.

You will be asked some questions about each website. For any question, if you do not have an opinion, please indicate so. Please do not guess.

Continue »

Privacy Policy · Help

Appendix C: Screenshots

IMAGE SERIES 3001-3

## Q360



Please review the three webpages from the following website and then answer the question that will appear below after you review the three pages.
Home
About Us
Why Test?
Products & Services
Testimonials
Ordering
Partnerships
Resources
Your Future Health
YFH
The premier blood testing and customized nutrition analysis company since 1976
1-877-468-6934
Enhancing Your Future Health!
Helping All Ages Be Healthy!
Basic HealthPrint Overview
HealthPrint
HealthPrint is our most comprehensive service. This premium service is designed for people who want complete control over their health. HealthPrint is customized to your unique biochemistry and includes detailed nutrition analysis that specifies the foods and supplements you need to be at your best. HealthPrint clearly identifies which tests you need to improve in order to optimize your health. You receive the test results directly from YFH. Your doctor does not need to order the tests or release the results to you.
HealthPrint was created based on a very simple principle that normal blood test scores are not good enough. HealthPrints go above and beyond the standard lab normal ranges that compare you to generic population averages taken from people who are already sick. In addition to normal ranges, your HealthPrint will compare your scores to customized Optimum Ranges. HealthPrints are very specific, but they are also very easy-to-understand. Now you don't have to wait until you feel sick to make changes to your health.
proactive and have the self-determination to make changes to your diet.
2 OF 3 IMAGES



Appendix C: Screenshots





Q365



Appendix C: Screenshots

Q370



Appendix C: Screenshots

Q375



IMAGE SERIES: 4001-3

Q360



Appendix C: Screenshots



Appendix C: Screenshots



Appendix C: Screenshots

Q365



Please explain in as much detail as possible what makes you think that the services offered on this website are from the same company as the website you were shown in the first section of the survey?

Appendix C: Screenshots

Q370



Q375



Please explain in as much detail as possible what makes you think the services offered on this website are affiliated with, or sponsored or approved by, the company whose website you were shown in the first section of the survey.

Appendix C: Screenshots

IMAGE SERIES 5001-3.

## Q360





Appendix C: Screenshots



Appendix C: Screenshots

Q365



Appendix C: Screenshots

Q370



Q375

