# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**SUPERIOR CONSULTING SERVICES, INC.,**

        **Plaintiff,**

v.                                                   **Case No: 6:16-cv-2001-Orl-31GJK**

**SHAKLEE CORPORATION and SHAKLEE U.S., LLC,**

        **Defendants.**

## ORDER

This Matter comes before the Court after evidentiary hearings on the Plaintiff's Daubert Motion to Exclude Hal Poret (Doc. No. 172), the Defendant's Daubert Motion to Exclude Kirk Martensen (Doc. 173), and the accompanying responses from Plaintiff and Defendant.

### I. Factual and Procedural Background

Superior owns two Florida fictitious business entities called "Your Future Health" and "YFH" (collectively "Superior"). Doc. 20 ¶ 5. Eleanor Cullen owns and operates Superior. Superior's "primary objective is the early detection of disease, through performing certain laboratory tests, including blood tests, for consumers." *Id.* ¶ 7. Superior accomplishes its objective by creating a profile "customized to a client's unique biochemistry," called a "Healthprint." *Id.* ¶ 11. Superior has registered the mark "Healthprint" twice with the United States Patent and Trademark Office ("USPTO"). Registration number 2646571 was obtained on November 5, 2002, and registration number 2928465 was obtained on March 1, 2005. Doc. 20 ¶¶ 14, 16. The USPTO did not require proof of a secondary meaning for either mark. *Id.* ¶ 18. On November 8, 2008, and February 5, 2011, Superior filed declarations of incontestability for the marks.

On June 8, 2016, Shaklee, a corporation that manufactures and distributes nutrition supplements, beauty products, and household-cleaning products, filed a trademark application with the USPTO claiming a similar "Healthprint" mark. Shaklee's Healthprint refers to a free, online survey that consists of twenty-two questions about a client's personal characteristics, habits, and goals. Doc. 43–8 ¶ 13. Once the client answers all of the questions, he or she is presented with "a customized set of Shaklee products that fits [his or her] health goals, needs and budget." Doc. 43–7, Ex. 1 at 1.

On December 14, 2017, Superior filed its Second Amended Complaint alleging trademark infringement and violations of the Florida Deceptive and Unfair Trade Practices Act. Doc. 159. On January 2, 2018, Shaklee filed its Answer, Affirmative Defenses, and Counterclaim. Doc. 166. On January 12, 2018, Superior filed the Motion to Exclude Hal Poret under Daubert (Doc. 172), and Shaklee filed the Motion to Exclude Kirk Martensen (Doc. 173) that same day. On February 2, 2018, Shaklee filed its Response (Doc. 231), and Superior filed its Response (Doc. 243). The Court held an evidentiary hearing on the Motion to Exclude Kirk Martensen on April 18, 2018. Doc. 282. On April 19, 2018, the Court held an evidentiary hearing on the Motion to Exclude Hal Poret. Doc. 286.

## II. Legal Standards

Federal Rule of Evidence 702 governs the admission of expert witness testimony. It provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of the opinion testimony has the burden of establishing each precondition to admissibility by a preponderance of the evidence. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1292 (11th Cir. 2005).

In *Daubert v. Merrill Dow*, 509 U.S. 579 (1993), the Supreme Court admonished trial courts to fulfill a gatekeeping role in the presentation of expert testimony. To guide district courts' assessments of the reliability of an expert's testimony, the Supreme Court identified four factors that district courts should consider: (1) whether the expert's methodology has been tested or is capable of being tested; (2) whether the theory or technique used by the expert has been subjected to peer review and publication; (3) whether there is a known or potential error rate of the methodology; and (4) whether the technique has been generally accepted in the relevant scientific community. *See id.* at 593–94. At the same time, the Court has emphasized that these factors are not exhaustive and are intended to be applied in a "flexible" manner. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999). District courts are charged with this gatekeeping function "to ensure that speculative, unreliable expert testimony does not reach the jury" under the mantle of reliability that accompanies the appellation "expert testimony." *Rink*, 400 F.3d at 1291 (quoting *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002)).

**III.   Analysis**

These expert witnesses are presented with respect to the issue of the likelihood of customer confusion between the two Healthprint marks, the most critical factor in a trademark infringement claim. *See, e.g.*, *Wesco Mfg., Inc. v. Tropical Attractions of Palm Beach, Inc.*, 833 F.2d 1484, 1488 (11th Cir. 1987). Each witness conducted a survey designed to measure the likelihood of confusion. Needless to say, the Plaintiff's expert found a high likelihood of confusion, while the Defendant's expert found a low likelihood of confusion. Neither party attacks the credentials of either witness,

and both surveys are clearly relevant and would be helpful to a jury. Accordingly, the Rule 702 problem here is one of reliability.

The methodology of a survey conducted by an expert witness is important to the Court's determination of reliability. A *Squirt* survey format "presents a respondent with both of the conflicting marks." 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:173.50 (5th ed.). Superior and Shaklee each describe their own experts' surveys as *Squirt* surveys. However, the methodologies of the two surveys are extraordinarily different. Poret's survey included static images of web pages from both Superior's and Shaklee's websites, displayed the two Healthprint marks as they appeared on those web pages, and asked questions to determine whether there was confusion between the two Healthprint marks that could be attributed to the alleged infringement. Poret's survey also included a control group to weed out "noise." Martensen's survey displayed the word "Healthprint" in plain font, used no marketing materials whatsoever, described Superior's Healthprint service but not Shaklee's, and posed various questions in an attempt to ascertain whether respondents believed the Healthprint name and/or service came from a single company. Martensen did not use a control group in his survey.

Although *Squirt* surveys are generally accepted by the courts, the Martensen survey does not comply with the basic tenents of a *Squirt* survey, and the methodology he used is not reliable.

### a. Expert Testimony of Kirk Martensen

Shaklee argues that Martensen's report should be excluded for several reasons: (1) the survey does not show Superior or Shaklee's Healthprint marks as they would be encountered in the marketplace; (2) the survey contains no control group; (3) the survey contains a question that implies there is a single "Healthprint" company, tainting the remainder of the survey; (4) the survey never describes the services offered by Shaklee under the Healthprint mark; and (5) the survey fails to use

a proper universe of survey respondents. Doc. 173 at 2-3. Superior's primary response is that any problems with the survey are technical issues that go to the weight of the survey, not its reliability. It is the very substance—not the format—of the survey questions that renders the survey unreliable. *Cf. Jellibeans, Inc. v. Skating Clubs of Georgia, Inc.*, 716 F.2d 833, 845 (11th Cir. 1983) (indicating that problems with the format of the questions go to the weight, and not the admissibility, of a survey). The problem with Martensen's survey, however, is not that the survey failed to show confusion; rather, the problem is that the survey questions could not possibly show confusion even if confusion were present.

First, instead of presenting respondents with the two Healthprint marks that are in dispute, Martensen's survey simply included questions that inquired about the word "Healthprint," asking, for example, in question 14, whether respondents believed it was from one company, more than one company, or no company at all.[1] Doc. 1731-1 at 27. Superior maintains that this was appropriate because "most of Superior's consumers do not have their first interaction with Superior's Healthprint mark visually." Doc. 243 at 15. But the mere use of the word "Healthprint" is not a reliable means of depicting the way in which consumers would be exposed to Superior or Shaklee's Healthprint in the marketplace. Indeed, Martensen acknowledged that the survey did not show either Healthprint mark as it is depicted in the marketplace. Doc. 293 at 42. Additionally, the survey did not show any marketing materials at all to the respondents, web-based or otherwise. Doc. 293 at 43. Notably, one district court has stated that a survey—also conducted by Martensen—was deficient for failing to show marks as they appeared in the marketplace and instead displaying only the

---

[1] Notably, Martensen's sixth survey question lists "Healthprint" as though it were the name of a single company. Doc. 173-1 at 20. Shaklee contends that listing "Healthprint" as a single company tainted the results of the survey. Doc. 173 at 13. The sixth question was certainly suggestive, and could very well have tainted later responses to the question about whether "Healthprint" was from a single company.

disputed words, unadorned, "without any indication of what the marks actually looked like." *See Reserve Media, Inc. v. Efficient Frontiers, Inc.,* No. CV1505072DDPAGRX, 2017 WL 1377591, at *6 (C.D. Cal. Apr. 14, 2017). Here, usage of the word "Healthprint" alone, in plain font, is particularly odd since Superior has repeatedly drawn attention to the issue of similarity between Superior's and Shaklee's Healthprint logos.

The Martensen survey also fails to use a control group.[2] Martensen maintained that while a control group was not necessary in this situation, he used a "control question." Doc. 293 at 16, 22-23. However, during the evidentiary hearing, it became clear that Martensen's "control question" was nothing more than a question with duplicate answer choices, intended to reveal inconsistency in order to ascertain whether respondents were paying attention. *Id.* at 17-18. The duplicate answer choices were both contained within the fifth survey question, so at most, it tested whether respondents were paying attention while answering that particular question. Such a question would not aid in determining whether the respondents were confused because of the similarity of the marks or for some other reason. Martensen was correct when he initially wrote in his report that controls were not "included in the survey." Doc. 173-1 at 5. With no control group and no legitimate control question, the Court cannot determine whether it was the infringing mark that was the source of confusion among respondents. Although Martensen's report opines that controls were not necessary because the survey assessed the presence of confusion, and not the cause of confusion, the presence of confusion is meaningless for purposes of this case if it does not come from the allegedly infringing mark. Allowing evidence of confusion not attributable to the infringing mark would only serve to

---

[2] A properly constructed survey will generally have a control group; control groups are necessary because they can show the cause of confusion and because they reduce background "noise," including those respondents who agree with most any survey assertion and those who tend to "quickly guess . . . because they are bored or hurried." 6 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 32:187 (5th ed.).

confuse the jury. Accordingly, the lack of a control undermines the reliability of the Martensen survey.

Adding to its reliability problems, Martensen's survey fails to actually describe Shaklee's Healthprint service. At the evidentiary hearing, Martensen indicated that he believed that question 17's description of the Healthprint service included both Superior's and Shaklee's Healthprints. Doc. 293 at 33. However, that description specifically says that "the Healthprint service provides early detection of disease for individuals by reviewing answers to health questions and performing laboratory tests, with or without a blood test." *Id.* at 34. While that may describe Superior's Healthprint, it does not describe Shaklee's Healthprint. Martensen testified that the description was "an attempt to include the combined services of [Superior's] Healthprint and Shaklee's Healthprint and to get a measurement on whether or not this, as it's written, would be viewed as—to the respondents from a single company, more than one company, or whether or not they didn't know." *Id.* at 36. However, question 17 straightforwardly states that the service described involves performing laboratory tests. *Id.* at 37-38. Shaklee's Healthprint service does not involve performing laboratory tests. A respondent can only compare and contrast two services if they are first given two services to compare and contrast. Martensen's survey gave only one, so if any of the respondents rightfully believed that that the described service came from one entity, it is unremarkable.

After considering Martensen's report it in its entirety and the testimony presented at the evidentiary hearing, the Court finds that Martensen's expert testimony is fatally flawed. Accordingly, the Court will not allow this speculative and unreliable expert testimony to reach the jury.

### b. Expert Testimony of Hal Poret

Superior makes three arguments as to why the Poret Report should be excluded: (1) Poret's survey failed to identify the proper universe of respondents; (2) Poret's survey used a flawed methodology; and (3) Poret's survey showed respondents more stimuli from Shaklee's use of the Healthprint mark than that of Superior's use of the Healthprint mark. [3] Doc. 172 at 2-3.

### 1. Poret's Survey Universe

Superior argues that the universe of the survey was under-inclusive for purposes of both reverse and forward confusion.[4] The Poret survey defined the appropriate universe as "[1] U.S. consumers age 21 and older [2] who would consider using blood-testing services to analyze nutritional needs." Doc. 172-1 at 62. Superior takes issue with both elements of the Poret survey universe.

First, Superior contends that the universe fails to account for those would-be Superior consumers that want a nutritional consultation without a blood test. Doc. 172 at 11; Doc. 295 at 57. Superior makes much of Poret "learn[ing] for the first time [at his deposition] that Superior offers its Healthprint service both with a blood test and without a blood test." Doc. 172 at 12.[5] However,

---

[3] At the evidentiary hearing, Superior contended that the change for Poret's control group—changing "Healthprint" to "Healthstamp"—was minimal. Doc. 295 at 63. Superior describes this as an inappropriate "infringing control." *Id.* However, Superior gave no significant reasons as to why the change was inappropriate for purposes of creating a control group, and the Court sees none.

[4] Forward confusion occurs when "the defendant adopts[s] a confusingly similar mark in order to free-ride on the plaintiff's goodwill and reputation." *Phelan Holdings, Inc. v. Rare Hosp. Mgmt., Inc.*, No. 8:15-CV-2294-T-30TBM, 2017 WL 1135266, at *3 (M.D. Fla. Mar. 27, 2017), *appeal dismissed*, No. 17-11852-JJ, 2017 WL 5013602 (11th Cir. July 27, 2017). Reverse confusion "occurs when a much larger defendant 'saturates the market with a trademark similar or identical to that of a smaller, senior user.'" *Id.* (quoting *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 957 (7th Cir. 1992)).

[5] Although there is some evidence that Superior has provided some customers a Healthprint without a blood test, it clearly did not market Healthprints without blood tests to the general public.

Mrs. Cullen indicated that she deliberately avoided advertising or promoting the Healthprint without a blood test. Doc. 176 at 296. She directly stated that ordinary people would not know about the Healthprint without a blood test because she "do[es]n't want business from other new people," explaining instead that she only does those "Healthprints" for people with whom she already has a relationship. *Id.* Superior's Your Future Health website never mentions such a Healthprint. Because Mrs. Cullen performed such tests only as "a labor of love," Poret had no reason to include the Healthprint without a blood test in the survey. It is therefore reasonable for the survey questions to be limited to those services that were held out by Superior as being available to the public. And regardless of the percentage of sales that came from Superior's website, the website was the way in which Superior held out itself and its services to the public at large.

Superior argues that the universe is also under-inclusive because it eliminates prospective Shaklee customers who are not interested in a blood testing service. Doc. 295 at 57. The Poret survey included a question for which the results indicated about seventy percent of the survey participants were prospective users of online health questionnaires. *Id.* at 6. Evidently, most of those surveyed were also interested in the type of service provided by the Shaklee Healthprint. *Id.* at 7. To the extent that the universe was under-inclusive as to prospective Shaklee consumers, it was not fatally so, and any error there should be dealt with by cross-examination, not exclusion.

Superior's second universe criticism stems from what it claims are its "primary customers," who are allegedly between fifty and ninety years old. Doc. 172 at 13-14. But Superior never claims that its customer base is limited to those over fifty years of age. In fact, the Court notes the Martensen survey included respondents over the age of 18, not just those over 21, making it an even broader universe than that of the Poret survey. While Superior boldly claims that "only one in three respondents were in the same demographic as Superior's consumers," *id.* at 14, that statement is

contradicted by Mrs. Cullen's deposition testimony. According to Mrs. Cullen, Superior's customer base included "a lot of kids," and "a lot of 40- and 50- year-olds." Doc. 176 at 259. It would have been improper to limit the survey respondents by age when Superior's own customers are not so limited. Furthermore, the Poret survey's results can be narrowed by age, and respondents aged fifty-five and older had a lower percentage of net confusion than did younger respondents. Doc. 295 at 20, 67. The age of the respondents in the survey universe does not render Poret's survey unreliable under Rule 702.

### 2. Poret's Methodology

Superior also argues that Poret's methodology was flawed, because Poret's survey used static screenshots instead of actual web pages. Superior similarly contends that Poret's methodology was flawed because brochures and word of mouth are the primary ways that Superior's Healthprint is advertised. *See* Doc. 295 at 60. Poret testified that he used static images because that was the only way to tell what the respondents actually saw and that, in this situation, there was nothing left out of the user experience by showing a succession of fixed webpages. Doc. 295 at 9-10, 13. There is no apparent reason why the usage of brochures would be more reliable than webpages here, and there is simply nothing unreliable in the use of Shaklee's website.

### 3. Stimuli Disparity

Superior takes issue with the disparity in the number of static webpages shown to respondents that belonged to Shaklee and the number that belonged to Superior. Doc. 172 at 23.[6] Because Shaklee's questionnaire pages were shown, Superior contends that its own health and nutrition-related questions should have been shown. *Id.* at 24. Poret explained at the evidentiary hearing that he did not include those questions because they only appeared on Superior's order form,

---

[6] Shaklee's website contains more pages than Superior's website.

which included prices, technical-sounding blood tests, and a doctor notification form. Doc. 295 at 46-47. If anything, including that page would have served to further emphasize the costly blood tests associated with Superior's Healthprint, distinguishing it even more from Shaklee's Healthprint and decreasing the likelihood that the survey would find customer confusion. Leaving out that page was not prejudicial to Superior, and it does not impugn the reliability of the survey. The Poret survey is admissible.

**IV.** **Conclusion**

For the foregoing reasons, Shaklee's Motion to Exclude Kirk Martensen under Daubert (Doc. 173) is **GRANTED**. Superior's Motion to Exclude Hal Poret (Doc. 172) is **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on May 4, 2018.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party