# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

SUPERIOR CONSULTING SERVICES,
INC.,

        **Plaintiff,**

v.                                **Case No: 6:16-cv-2001-Orl31GJK**

SHAKLEE CORPORATION and
SHAKLEE U.S., LLC,

        **Defendants.**

---

## MEMORANDUM OPINION AND ORDER

This is a trademark dispute over use of the name "Healthprint." The case was tried before the Court without a jury in September 2018.[1] Following the filing of the official trial transcript,[2] the parties filed post-trial memoranda. (Doc. 426 as to Plaintiff; Doc. 425 as to Defendant). The dispute is now ripe for resolution, and this Opinion contains the Court's findings and conclusions as required by Rule 52 of the Federal Rules of Civil Procedure.

### I. Procedural Background

Plaintiff Superior Consulting Services, Inc. ("Superior") d/b/a Your Future Health ("YFH") filed suit against Defendant Shaklee Corp. ("Shaklee") on November 1, 2016. Doc. 1.[3] Superior

---

[1] Prior to trial, the Court granted Defendant's Motion for Bench Trial (Doc. 328), because Plaintiff's only claim for relief was the equitable remedy of disgorgement. Doc. 339 at 4. Plaintiff's appeal of that Order (Petition for Writ of Mandamus) was denied. Doc. 400.

[2] The transcript is divided into five days. Reference to the transcript will be by day, followed by the page and line numbers.

[3] Shaklee U.S., LLC was later added as a party. Doc. 157. The two Shaklee entities will be referred to herein collectively as "Shaklee."

also filed a motion for preliminary injunction, which the Court denied. Doc. 49. Superior took an interlocutory appeal of that denial, and the Eleventh Circuit affirmed the Court's denial. Doc. 126.

On December 14, 2017, Superior filed its Second Amended Complaint. Doc. 159. Count I of the Second Amended Complaint alleges Direct Federal Trademark Infringement; Count II alleges Vicarious Federal Trademark Infringement; Count III alleges violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUPTA"), or, in the alternative, common law unfair competition; Count IV alleges common law trademark infringement; Count V alleges statutory trademark dilution in violation of 15 U.S.C. § 1125 and Florida Statute § 495.001, *et seq.*; Count VI alleges Federal Trademark Unfair Competition under 15 U.S.C. § 1125(a); and Count VII alleges common law tortious interference with advantageous business relationships.

On January 2, 2018, Shaklee filed its Answer, Affirmative Defenses, and Counterclaim. Doc. 166. Count I of the Counterclaim alleges Statutory Trademark Dilution; Count II seeks declaratory relief based on alleged invalidity of Superior's Healthprint mark for nutritional supplements; and Count III seeks declaratory relief under FDUPTA.

On April 16, 2018, the Court granted Shaklee's Motion for Summary Judgment in part, dismissing Counts V and VII of the Second Amended Complaint. Doc. 281.

## II. Basic Undisputed Facts [4]

Superior is a Florida direct-to-consumer third-party laboratory testing company owned by Eleanor Cullen ("Cullen"). On its website, Superior describes itself as "the premier blood testing and customized nutrition analysis company since 1976." Pl. Ex. 35 at 6. Superior owns two federal trademarks on the mark "Healthprint." Registration number 2646571 ("TM-1") was obtained on

---

[4] These facts are largely taken from the parties' joint pretrial statement. *See* Doc. 355 at 10-12.

November 5, 2002. TM-1 pertains to nutritional supplements for general health maintenance and printed instructional material and consulting services in the filed of health care. *See* Pl. Ex. 54. Registration number 2928465 ("TM-2") was obtained on March 1, 2005. TM-2 pertains to blood testing services and consultation in the fields of food nutrition, diet, and health. *See* Pl. Ex. 55.

Shaklee is a world-wide manufacturer and distributor of natural nutritional supplements, weight management products, beauty and personal care products, water filtration systems, and household cleaning products. Shaklee owns federal trademarks on the "Shaklee" mark. Shaklee does not sell blood testing services, nor has it ever used Healthprint to promote blood testing or blood testing services. *See* Tr. 3 at 98:1-2, 13-16. Likewise, Shaklee does not affix "Healthprint" to any Shaklee products, which are all sold under the "Shaklee" marks. *See* Tr. 1 at 58:25-59:5.

In June and August of 2016, Shaklee filed trademark applications with the USPTO claiming a similar "Healthprint" mark. Pl. Ex. 56, 57. [5] Shaklee's Healthprint pertains to providing information in the field of personal improvement. It specifically excludes healthcare information. Shaklee's Healthprint is used with a free, online survey that consists of questions about a client's personal characteristics, habits, and goals. Pl. Ex. 59. Once the client answers all of the questions, he or she is presented with a personalized nutritional plan. *See, e.g.,* Pl. Ex. 97; Tr 3 at 113:6-24.

### III. Discussion and Analysis

#### A. Superior's Trademark Claims.

The analysis is the same for each of Superior's trademark claims. *See Gift of Learning Found, Inc. v TCG Inc.*, 329 F.3d 792, 802 (11th Cir. 2003); *Rain Bird Corp. v. Taylor*, 665 F. Supp. 2d 1258, 1267 (N.D. Fla. 2009). Each claim is based on infringement and unfair competition with

---

[5] Those applications have been held in abeyance pending resolution of this lawsuit. One such application has been suspended pending disposition of this case, *see* Pl. Ex. 56, and the other is currently under an extension of time, *see* Pl. Ex. 57.

Superior's Healthprint marks, and the analysis is the same with respect to both of Superior's Healthprint marks.[6]  To prevail on infringement, Superior must prove that it owns the mark, that it has priority, and that Shaklee's use of the mark is likely to cause confusion. *See Frehling Enters, Inc. v. Select Group Inc.*, 192 F.3d 1330, 1335 (11th Cir. 1999).

It is undisputed that Superior owns the mark in question and that it has priority over Shaklee's use of the mark.   Thus, the essence of this case is whether Shaklee's use of its Healthprint is likely to cause confusion with Superior's use of the mark. *See id.*

The Eleventh Circuit uses a seven-factor test to analyze trademark infringement claims. The factors include: (1) the type of the mark, (2) the similarity of the marks, (3) the similarity of products the marks represent, (4) the similarity of the parties' retail outlets and customer base, (5) the similarity of advertising media, (6) the defendant's intent, and (7) actual confusion. *Id.* The type of mark and the evidence of actual confusion are the most important factors. *Id.*

(1) <u>Type of mark.</u>   Trademark protection is only afforded to distinctive marks.   The stronger the mark, the greater the protection. A mark's USPTO registration creates a refutable presumption of distinctiveness. *See* 15 U.S.C. § 1057(b). Superior registered both marks with the USPTO and both acquired incontestable status. Accordingly, Superior's mark is, at a minimum, descriptive, and a "relatively strong mark." *See Frehling Enters, Inc.*, 192 F.3d at 1336.   Since "the USPTO did not require evidence of secondary meaning, the presumption is that the mark is 'inherently distinctive.'" Doc.

---

[6] Although Superior's TM-1 relates to nutritional supplements, instructional material, and consulting services in the field of healthcare, Superior does not sell supplements and its use of the Healthprint mark is primarily used in connection with its blood testing service. Accordingly, unless otherwise specified, this Opinion relates to the service mark, TM-2.

126 at 9-10. Shaklee did not rebut this presumption; thus, Superior's mark is distinctive and entitled to strong trademark protection.

(2) <u>The similarity of the marks.</u> Similarity of marks looks to "the overall impressions that the marks create." *Frehling*, 192 F.3d at 1337. Shaklee's mark is nearly identical to Superior's mark, except for the use of Shaklee's name preceding the mark. Additionally, Shaklee uses the same thumbprint logo with its mark. The Court thus finds that the marks are substantially similar.

(3) <u>The similarity of the products the marks represent.</u> "This factor requires a determination as to whether the products are the kind that the public attributes to a single source, not whether the purchasing public can readily distinguish between the products of the respective parties." *Frehling*, 192 F.3d at 1338. Here, there is a significant difference between the relatively expensive and intrusive blood testing service offered by Superior's Healthprint and the free online survey offered by Shaklee's Healthprint. In upholding this Court's denial of Superior's Motion for Preliminary Injunction, the Eleventh Circuit said, ". . . there seems to be no real possibility that a reasonable consumer would mistake the source of Superior's blood-test request form with that of Shaklee's free questionnaire, particularly where Superior's website is rife with references to the company's focus on laboratory work." Doc. 126 at 21. Superior presented no evidence at trial to undermine this conclusion. The Court finds, therefore, that the products involved are dissimilar, and this factor strongly supports Shaklee.

(4) <u>Similarity of retail outlets and customer base.</u> The likelihood of confusion is greater where the Plaintiff and Defendant use similar retail outlets and advertising media and target similar customers. *Frehling*, 192 F.3d at 1339. As noted by the Eleventh

Circuit, the parties here clearly share a customer base, notwithstanding the disparity in product and pricing. Doc. 126 at 16. However, the Eleventh Circuit found no clear error in this Court's prior conclusion that this factor is neutral, and nothing presented at trial warrants a different conclusion.

(5) Similarity of advertising media. Courts must compare the parties' advertisements and the audiences they reach. *Fla. Int'l Univ. Bd. of Trustees v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1262 (11th Cir. 2016). "The greater the similarity, the greater the likelihood of confusion." *Id.* (internal quotation omitted). "[T]he standard is whether there is likely to be significant enough overlap" in the audience of advertisements "that a possibility of confusion would result." *Frehling*, 192 F.3d at 1340. Here, both parties use word of mouth, the Internet, and e-mail.[7] And, to some extent, the audience for this media may overlap. But the disparity between the services provided renders this factor only slightly positive toward confusion.

(6) *Shaklee's intent.* If it can be shown that Shaklee adopted the Healthprint mark with the intent to poach Superior's good will, this fact would be strong evidence of confusing similarity. *Frehling*, 192 F.3d at 1340 (*citing John H. Harland Co. v. Clarke Checks, Inc.*, 711 F.2d 966, 977 (11th Cir. 1983)). In examining this factor, the Court must determine "whether [Shaklee] had a conscious intent to capitalize on the [P]laintiff's business reputation, was intentionally blind, or otherwise manifested improper intent."

---

[7] In its post-trial brief. Superior contends that both parties also use radio and social media. Doc. 426 at 10-11. Superior's reference to Shaklee's use of this media is the deposition of George Shehata in Doc. 421 at 119-129. However, this portion of Shehata's deposition was not designated and is not, therefore, in evidence.

*Custom Mfg. v. Midway*, 508 F.3d 641, 648 (11th Cir. 2007) (internal quotations omitted).

The evidence at trial showed that Shaklee used an elaborate and lengthy process to select Healthprint as the mark to use on its new online questionnaire. Tr 3 at 99:1-104:25. In the spring of 2016, Shaklee organized a working group to develop the questionnaire, headed by George Shehata. *Id*. at 112:7-15. The group consisted of members from health sciences (Dr. Jamie McManus), marketing, and technology, who met at least weekly. *Id*. at 112:22-116:2. They did consumer testing, and after several brainstorming sessions, the group came up with several possible names for its online tool. *Id*. at 116:21-117:6, 119:22-120:25; Def. Ex. 32 at 5. Ultimately, they chose "Healthprint." Tr. 3 at 124:13-23.

After the name "Healthprint" was selected, Brian Fairbanks, a visual designer, was tasked with designing a logo. *Id*. at 125:7-10. After modifying stock photos that he obtained from third-party sources, Fairbanks presented various images to the team. *See id*. at 125:21-126:2; Def. Ex. 45. The group rallied around the first image, a green thumbprint, and that image was approved by Shaklee's CEO, Roger Barnett. Tr. 3 at 128:7-20; *see also* Def. Ex. 45.

Shaklee then hired a law firm to perform a trademark search, which revealed Superior's registration of the mark.[8] Upon receipt of the trademark report, Shehata accessed the YFH website and noticed that it was oriented around blood testing and medical diagnostics. Tr. 3 at 129:12-130:11. He concluded that Superior's Healthprint

---

[8] Prior to the trademark search, Shehata had never heard of Your Future Health. Tr. 3 at 128:25-129:5.

was entirely different than the Healthprint Shaklee proposed to use, because Superior's Healthprint was medically based, as opposed to Shaklee's simple questionnaire, which contained basic lifestyle and diet-type questions. *Id*. at 131:1-17. Shaklee launched its Healthprint in August of 2016. *Id*. at 132:2-4.

In an effort to refute the bona fides of Shaklee's development of its Healthprint mark, Plaintiff reverts to a series of events that occurred a decade earlier. One such episode took place in in 2004-2005 and involved discussions between Superior and Proctor & Gamble concerning a possible business arrangement between the two entities. Tr. 3 at 17:20-18:25.[9] At the time, Ms. Jennifer Steeves-Kiss was a member of the Proctor & Gamble team charged with examining that issue. Ten years later, Ms. Steeves-Kiss was a member of the Shaklee team that was developing its version of Healthprint. From this, Superior posits that Ms. Steeves-Kiss took the information she learned about Healthprint while at Proctor & Gamble in 2005 and used it to help Shaklee develop its Healthprint in 2016. This contention was the subject of a pretrial motion *in limine* filed by Shaklee (Doc. 256), which the Court conditionally granted. Doc. 319. After reviewing Ms. Steeves-Kiss's deposition (Doc. 422) and the trial transcript, the Court confirms its pretrial ruling and concludes that this evidence provides no support for Superior's contention that Shaklee intended to infringe Superior's trademark. Doc. 434.

Superior also points to another instance in 2006, involving e-mails and a telephone call regarding Superior's blood testing. Marjorie Fine, Shaklee's general counsel, and Dr. Jamie McManus, chair of Shaklee's medical affairs, became concerned that Cullen

---

[9] These discussions were protected by a confidentiality agreement that expired in 2010. Def. Ex. 118.

(a Shaklee distributor)[10] might be exposing Shaklee to risk if she was recommending Shaklee supplements based on her blood testing results. *See* Tr.3 at 152:1-155:5, 159:25-160:6; *see also* Def. Ex. 11. This concern resulted in a telephone call with Cullen in February 2006 in which Cullen explained her blood testing procedure and assured Shaklee that she was not recommending Shaklee products to treat disease. *See* Tr. 3 at 159:2-161:5. At the conclusion of the call, McManus requested additional documentation. Both she and Ms. Fine attest that Cullen never sent any additional documentation. Tr. 3 at 159:22-24, 204:19-23. While this evidence suggests that Shaklee was on notice in 2006 of Superior's blood testing service, and by implication, the name Healthprint, it does not imply that Shaklee somehow banked this knowledge and used it ten years later to infringe Superior's trademark. In sum, these communications do not support the intent element of Superior's proof.

There is simply no credible evidence that Shaklee adopted the Healthprint mark as a means to appropriate Superior's good will. Rather, Shaklee engaged in a deliberate and reasonable process to develop a mark which addressed Shaklee's distinct online questionnaire. Indeed, given Shaklee's concern about Cullen's use of blood testing for her Healthprint, it would be contrary to Shaklee's self-interest to invite a comparison. The intent factor does not support Superior's claim.

(7) <u>Actual confusion.</u> "It is undisputed that evidence of actual confusion is the best evidence of a likelihood of confusion. However, such evidence is not a prerequisite,

---

[10] Cullen ran her Shaklee distributor business through Abbi, Inc., a corporation owned by her. Tr. 3 at 202:16-20, 223:2-11. Ms. Fine started the process to terminate Cullen's distributorship as a result of the information learned in the instant case, but Cullen resigned before the status review board had the opportunity to terminate her. *Id.* at 210:23-211:5.

and thus it is up to individual courts to assess this factor in light of the particular facts of each case." *Frehling*, 192 F.3d at 1340 (internal citations omitted). In upholding this Court's denial of Plaintiff's Motion for Preliminary Injunction, the Eleventh Circuit found that Superior had "not produced any evidence of a customer mistakenly taking Shaklee's Healthprint questionnaire and thinking he or she was actually purchasing Superior's Healthprint." Doc. 126 at 20. And Superior produced no such evidence at trial.

At trial, Superior produced one "confusion" witness, Frank Murphy. *See* Tr. 1 at 150:1-4. Mr. Murphy is a longtime customer of YFH and his wife works for Cullen. *Id.* at 151:15-25. When informed by his wife that Shaklee was also using the name "Healthprint," he went online to see Shaklee's Healthprint. Although he claims to have been "confused," it appears that he was just angry that Shaklee was using the Healthprint mark. *Id.* at 156: 22-157:22, 178:2-11.[11] In her testimony, Carol Guth, Cullen's office manager, admitted that she was not aware of anyone who had made a purchasing decision based on confusion between the use of these two marks. *Id.* at 129:1-25. In her deposition, Cullen concurred. Tr. 2 at 141:24-142:7. Thus, absent any proof of actual confusion, this factor weighs heavily against Superior.

The overall balance. After evaluating each of these factors, the Court must consider the overall balance to determine the likelihood of confusion. *Frehling*, 192 F.3d at 1342. Although Superior has a strong mark that is substantially similar to Shaklee's mark, there is no evidence of actual confusion, or malintent on Shaklee's part, and the other factors do nothing to tip the scale in

---

[11] Notably, Superior does not mention Murphy's testimony in its post-trial submission.

Superior's favor. There is, however, evidence that strongly supports a finding that there is no likelihood of customer confusion, and that is the testimony of Shaklee's expert witness, Hal Poret.

Mr. Poret, a recognized expert in the field of market research, performed an online survey to test the likelihood of confusion between the two Healthprint marks. Using a group of 400 potential customers, Poret used a "squirt" survey method to compute a net rate of confusion between the two Healthprint marks.[12] Tr. 4 at 40:20-43:19. Using screenshots from the respective websites, the survey respondents were shown both Superior's and Shaklee's Healthprint marks in close proximity and asked questions as to whether they believed the two services come from the same company or are otherwise related. Poret concluded that there is a net rate of confusion of no more than 7% between the two marks. *Id.* at 60:1-21. A net rate of confusion at this level demonstrates that there is no likelihood of confusion between these marks. *Id.* at 60:11-61:11. The Court finds this evidence to be credible and highly persuasive.

Having considered the seven factors, the Court concludes that Superior has failed to prove infringement of its Healthprint mark. Judgment will be entered for Shaklee on Counts I, II, III, IV and VI of Superior's Second Amended Complaint.

**B. Shaklee's Counterclaim**

(1) <u>Count I – Statutory Trademark Dilution.</u>   In Count I of its counterclaim,[13] Shaklee seeks injunctive relief, contending that Superior's use of the Shaklee mark has

---

[12] The 400 respondents were divided into two groups of 200: a test group and a control group. Tr. 4 at 41:1-4. The control group is used to adjust for the placebo effect of taking a survey, thus eliminating false positive responses ("noise"). *Id.* at 55:8-56:6.

[13] Prior to trial, Shaklee sought to dismiss Count I without prejudice, in order to streamline the issues. Doc. 381. However, Superior objected (Doc. 384), and the Court denied the motion. Doc. 386.

diluted the distinctive quality and value of Shaklee's mark. Doc. 166 at 38-39. [14]

Injunctive relief for trademark dilution is available under 15 U.S.C. § 1125(c)(1), which states:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

Therefore, to prove a dilution claim, a plaintiff must prove that (1) the mark is famous; (2) the alleged infringer used the mark in commerce after the mark became famous; and (3) the infringer's use of the mark is likely to cause dilution by blurring or tarnishment.

A mark is considered famous "if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A). To determine whether a mark is recognized by the public, courts consider factors such as (1) the duration, extent, and geographic reach of advertising and publicity of the mark; (2) the amount, volume, and geographic extent of sales of goods or services offered under the mark; (3) the extent of actual recognition of the mark; and (4) whether the mark was

---

[14] This claim is based on both the Lanham Act, 15 U.S.C. § 1125, and Florida Statute § 495.001, *et seq.* The standard for establishing a trademark dilution claim under Florida law is essentially the same as under the Lanham Act, except that under Florida law, Plaintiff need only show that the mark is famous in Florida. *Holding Co. of the Villages, Inc. v. Little John's Movers & Storage, Inc.*, 2017 WL 6319549 at *3 (M.D. Fla. 2017).

registered. *Id.* To be famous, "a mark must have a degree of distinctiveness and strength beyond that needed to serve as a trademark . . . [it] must be truly prominent and renowned." *Carnival Corp. v. SeaEscape Casino Cruises, Inc.*, 74 F. Supp. 2d 1261, 1270 (S.D. Fla. 1999) (internal quotations omitted). "A party claiming dilution must establish that its mark is practically a household name of the likes of such giants of branding as Exxon, Kodak, and Coca Cola." *Holding Co. of the Villages, Inc.*, 2017 WL 6319549 at *4 (internal quotations omitted).

At trial, Shaklee presented evidence of the longstanding existence and use of its mark. *See generally* Tr. 3 at 92-96. It has an annual advertising budget of $85 million and sells its products in the United States through 340,000 independent distributors. *Id.* at 188:18-20, 96:1-3. Among other things, Shaklee has provided products to NASA for space exploration and has sponsored United States Olympic teams. *Id.* at 96:15-97:1. It has also been featured on TV shows such as Oprah and Dr. Phil. *Id.* at 97:2-6. According to Keven Crandall, vice-president of sales, Shaklee has been widely recognized and revered by customers in the multilevel marketing industry. Doc. 428 at 42:13-16, 43:1-13.

Notwithstanding its effort to support this claim, Shaklee has failed to prove that its mark is famous to the extent it has become a "household name," widely recognized by the general public to the same extent as the "giants of branding." *See Holding Co. of the Villages, Inc.*, 2017 WL 6319549 at *4. At best, it is simply well known in the dietary and nutritional supplement industry. Moreover, and importantly, Shaklee has failed to offer any credible proof that any of its customers or potential customers have formed a negative impression of Shaklee's products as a

result of Superior's alleged use of the Shaklee mark.[15]   Accordingly, Shaklee's dilution claim is without merit and judgment for Superior will be entered on Count I of Shaklee's counterclaim.[16]

(2) <u>Invalidity of Superior's TM-1 mark.</u>   In Count II of its counterclaim, Shaklee seeks declaratory relief holding Superior's TM-1 mark invalid due to abandonment.[17]   To prove abandonment of a trademark, a defendant must establish: "[1] that the plaintiff has ceased using the mark in dispute, and [2] that he has done so with an intent not to resume its use." *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1174 (11th Cir. 2002). For the purposes of the Lanham Act, "use" is defined as "the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark." 15 U.S.C. § 1127; *Emergency One, Inc. v. Am. FireEagle, Ltd.*, 228 F.3d 531, 536 (4th Cir. 2000). An intent not to resume use of a trademark "may be inferred from the circumstances." 15 U.S.C. § 1127.

Evidence of lack of qualifying use for three consecutive years constitutes prima facie evidence of abandonment.   15 U.S.C.§ 1127. "Because a finding of abandonment works an involuntary forfeiture of rights, federal courts uniformly agree that defendants asserting an abandonment defense face a 'stringent,' 'heavy,'

---

[15] Superior's use of the Shaklee mark was limited to marketing materials given to Shaklee distributors. S*ee, e.g.*, Def. Ex. 13, 14.

[16] In its post-trial submission, Superior seeks sanctions against Shaklee for its lackluster effort to prove its dilution claim. Doc. 426 at 36-37. While Shaklee's dilution claim was weak, it was not brought in bad faith and the Court declines to conclude that it was "exceptional" such that a fee-shifting award under the Lanham Act is justified.

[17] Shaklee also alleged that the mark was invalid because it was obtained through fraudulent representations that the mark was in use for supplements. However, this claim was not addressed in Shaklee's post-trial submission and will not be considered by the Court.

or 'strict burden of proof.'" *Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167, 1175 (11th Cir. 2002) (collecting cases) (internal citation omitted).

Shaklee claims that Superior has abandoned TM-1 because Superior does not sell supplements bearing the Healthprint trademark. Indeed, Superior has made it clear that in order to avoid a conflict of interest, it does not sell supplements and has no intent to do so in the future. *See* Tr. 2 at 116:21-23. Rather, Superior puts the Healthprint mark on supplement bottles that it gives away for promotional purposes. *Id.* at 60:18-61:3. Thus, Superior claims that the mere transportation of trademarked goods in interstate commerce will suffice. *See* Doc. 426 at 32.

Importantly, "neither promotional use of a mark on goods in a different course or trade nor mere token use constitute 'use' under the Lanham Act." *Emergency One, Inc.*, 228 F.3d at 536 *(citing Imperial Tobacco, Ltd. v. Phillip Morris, Inc.*, 899 F.2d 1575, 1592–83 (Fed. Cir. 1990)). Where the use of a mark does not "reflect a continual effort to create a viable business in the goods so marked," such use does not rise to the level of "use in commerce" as required under the Lanham Act. *White v. Paramount Pictures Corp.*, 108 F.3d 1392 at *3 (Fed. Cir. February 21, 1997).

While it is true that the meaning of "use in commerce" is not limited to profit-making activity, courts have found that promotional materials alone are often not enough to establish sufficient use under the Lanham Act. *Planetary Motion, Inc. v. Techsplosion, Inc.*, 261 F.3d 1188, 1195-96 (11th Cir. 2001) (collecting cases). Courts have found promotional efforts sufficient under some circumstances, such as where promotional mailings are coupled with advertiser or distributor solicitations

or where a title was announced to millions and promoted at an annual trade convention. *See id.* However, use has been found insufficient where "only a few presentations [of the promotional materials] were made." *See id.* at 1196 (citing *WarnerVision Entm't Inc. v. Empire of Carolina Inc.*, 915 F. Supp. 639, 645–46 (S.D.N.Y.)).

Superior argues that its "open" transportation constitutes use. While transportation can be enough, "the transportation must be *sufficiently* open or public." *Spiral Direct, Inc. v. Basic Sports Apparel, Inc.*, 293 F. Supp. 3d 1334, 1360 (M.D. Fla. 2017), *appeal dismissed*, No. 18-10189-AA, 2018 WL 1957605 (11th Cir. Mar. 13, 2018) (emphasis added). "'The requirement of open and public exposure' [must be] met." *Id.* (quoting 3 McCarthy on Trademarks and Unfair Competition § 19:118 (5th ed. 2017)). Open transportation is required because use in commerce, even through transportation, contemplates that "the intended buying public" will be "exposed to the mark." *Id.*. Superior's transportation did not result in any sales of supplements bearing the Healthprint mark, but it was open and it did result in consumers receiving the Healthprint supplements following both trade and radio shows.[18]

Accordingly, the Court finds that Superior has not abandoned its use of TM-1 and judgment will be entered for Superior on Count II of the counterclaim.

---

[18] Here, the transportation of "Healthprint" labeled supplements did not expose use of the Healthprint mark with respect to supplements to the would-be buyers of those supplements, because Superior was unwilling to sell such supplements. While this seems to go against the spirit of the requirement of open transportation, given the heavy burden at play, there is insufficient evidence to find that Superior abandoned TM-1.

(3) <u>Florida Deceptive and Unfair Trade Practices Act.</u>  In Count III of its counterclaim, Shaklee contends that Superior has violated the Florida Deceptive and Unfair Trade Practices Act, Florida Statute § 501.201, *et seq.* ("FDUTPA") by engaging in the unlicensed practice of medicine.  As a remedy, Shaklee requests a declaratory judgment.  It does not, however, specify any specific injunctive relief.  Doc. 166 at 41.

FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). Anyone "aggrieved" by a FDUTPA violation may bring an action for declaratory and injunctive relief. Fla. Stat. § 501.211(1). To be entitled to declaratory and injunctive relief under FDUTPA, the plaintiff must show that: 1) the defendant engaged in a deceptive act or unfair practice; and 2) the plaintiff is aggrieved by that act or practice. *CareerFairs.com v. United Bus. Media LLC*, 838 F. Supp. 2d 1316, 1324 (S.D. Fla. 2011).

(a) *Superior's deceptive acts.*  Shaklee contends that Superior has violated FDUPTA by engaging in the unlicensed practice of medicine, specifically by using blood testing to identify, diagnose, and treat a wide range of diseases and disorders. Doc. 166 at 40-41.[19]  In support of this contention, Shaklee points to various communications in which Cullen used her blood testing results to recommend supplements for the treatment of disease. *See, e.g.*, Def. Ex. 22, 23, 24, 27, 28 and 29.[20]  Several of these communications also reveal that Cullen's practice

---

[19] Cullen is not a licensed medical doctor.

[20] Shaklee also offered Def. Ex. 12 as an example, but Superior objected at trial and the

was to make these recommendations orally and not in writing. *See* Def. Ex. 22, 23, and 24.

To support its argument, Shaklee called Dr. Arthur Herold as an expert witness. Tr. 5 at 4:6-17. Dr. Herold is a family practitioner and an associate professor at the University of South Florida College of Medicine, with 38 years' experience. He is also the chief of the Department of Family Practice at the Tampa General Hospital, where he oversees approximately 50 physicians. *Id*. at 6:3-6. He was offered as an expert in the unlicensed practice of medicine and the Court recognized him as an expert in that field. *Id*. at 7:4-16.

Dr. Harold reviewed materials pertaining to YFH and concluded that Cullen was practicing medicine without a license. His conclusion was based on numerous considerations, including Cullen's "Master Symptom Tracker" (Def. Ex. 2), which he described as a typical form regarding potentially serious health issues used in a clinical medical practice. After the Master Symptom Tracker is completed by the "patient," blood tests are ordered and the test results are sent to Cullen. She then uses the results to make treatment decisions, which he describes as an intervention Tr. 5 at 10:7-25. Dr. Harold believes that this is a misuse of blood testing because the process should start with a clinical exam, a review of the patient's medical history, and then the ordering of blood tests that are necessary. *Id*. at 11:1-13:3. This is not something within the province of a registered nurse,[21] and he described Cullen's blood testing procedure as "totally inappropriate." *Id*. at 11:22-25.

Court reserved ruling. The Court now **SUSTAINS** the objection to Def. Ex. 12 as hearsay.

[21] Cullen is a registered nurse in New York, but not in Florida. Superior offered the testimony of Michelle Glower as an expert witness in the field of nursing. Tr. 2 at 156:3-157:1.

Dr. Harold was also critical of Cullen's basic premise that blood test results within a normal range can still be indicative of disease.[22]   According to Dr. Harold, "That's not the proper way to look at laboratory testing. . . . [I]t's being turned upside down by Mrs. Cullen by suggesting that although your ranges are normal, you very well could be headed for the disease." *Id*. at 13:15-16:17.   He also found that the YFH Doctor Notification Agreement (Def. Ex. 4 at 5) was deceptive because it says that the laboratory's medical director reviews the patient's test results. According to Dr. Harold, this is "blatantly false." *Id*. at 14:22.

After reviewing Defendants' Exhibits 12,[23] 22, 23, 24, 27, and 28, Dr. Harold discussed the dangers of mega-dosing, using supplements to treat disease, and Cullen's interference with the doctor-patient relationship.[24]   *See generally* Tr. 5 at 19-33.   In conclusion, Dr. Harold's opinion is that "this is practicing medicine, . . . and is not under the domain of an RN." *Id*. at 30:3-7.   He further concluded that this unlicensed practice creates a lot of potential harm. *Id*. at 30:8-17.   The Court agrees.   Shaklee has proven that YFH (Cullen) is engaged in the unlicensed practice of medicine, which is actionable under FDUPTA.

---

Mrs. Glower's testimony was neither germane nor helpful and she appeared to be more of a cheerleader for Cullen than an independent expert, referring to the lawsuit as "frivolous." *Id*. at 180:19-20.   The Court gives no weight to Mrs. Glower's testimony.

[22] YFH's motto is, "normal blood test scores are not good enough." *See* Def. Ex. 1.

[23] Although Defendants' Exhibit 12 was excluded as an exhibit, an expert can rely on hearsay in forming an opinion. *See* Fed. R. Evid. 703. Moreover, Defendants' Exhibit 12 is only one of many examples where Cullen used blood testing to treat disease.

[24] Dr. Harold also found it concerning that Cullen has a practice of not putting her recommendations in writing. Tr. 5 at 22:17-23:4.

(b) Superior does not seriously challenge the contention that Cullen is practicing medicine without a license.[25] Rather, Superior contends that Shaklee is not an aggrieved party and thus has no standing to bring the claim. There is no specific definition of the term "aggrieved" in the statute, but a party is aggrieved when it has an injury that is more than speculative. *Ahearn v Mayo Clinic*, 180 So.3d 165, 172-173 (Fla. 1st DCA 2015). An aggrieved party must be able to demonstrate some specific past, present, or future grievance. *Id*. at 173. However, since Shaklee seeks only injunctive relief, it must demonstrate a real and immediate threat of future injury in order to satisfy Article III standing. *Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1329 (11th Cir. 2013).

Shaklee's theory of harm is that Cullen (d/b/a Abbi Inc.), acting as a Shaklee distributor, could subject Shaklee to liability for Cullen's unlawful prescription of Shaklee supplements to treat disease or improve one's health. But, Cullen's effort to market the FYH Healthprint to Shaklee distributors never got off the ground, and in any event, Cullen (Abbi) is no longer a Shaklee distributor. Accordingly, there is no likelihood of future injury. Shaklee is not, therefore, an aggrieved party and has no standing to seek injunctive relief. Judgment will be entered for Superior on Count III of Shaklee's counterclaim.

---

[25] Superior's argument is limited to the fact that a medical doctor, Tamara Sachs, approved the list of blood tests offered by YFH as well as the normal range for their results. Doc. 426 at 36. When ordering blood tests, Cullen uses scripts pre-prepared by Dr. Sachs. However, Dr. Sachs plays no part in deciding what particular tests are ordered, nor does she analyze the results or contribute to any intervention resulting therefrom. *See* Tr. 1 at 104:22-105:2. Thus, Superior's Healthprint service is not conducted under the supervision of a medical professional.

## IV. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that judgment be entered for Shaklee on Counts I, II, III, IV, and VI of the Second Amended Complaint, and that judgment be entered for Superior on Counts I , II, and III of the Counterclaim.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on February 25, 2019.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party